**Stephen KING, Plaintiff–Appellee,**

v.

**ALLIED VISION, LTD.; and Innovation Books, a division of the Innovation Corporation, Defendants,**

**New Line Cinema Corporation, Defendant–Appellant.**

**Nos. 1996, 1997, Dockets 94–7409, 94–7225.**

United States Court of Appeals, Second Circuit.

Argued May 15, 1995.

Decided Sept. 15, 1995.

Melvyn R. Leventhal, Leventhal Slade & Krantz, New York City (Marianne Yen, Leventhal Slade & Krantz, on the brief), for defendant-appellant.

Paul R. Levenson, Cowan Liebowitz & Latman, P.C., New York City (Robert W. Clarida, Cowan Liebowitz & Latman, P.C., Peter Herbert, Philippe Zimmerman, Moses

& Singer, New York City on the brief), for plaintiff-appellee.

Before: ALTIMARI, MAHONEY, and WALKER, Circuit Judges.

ALTIMARI, Circuit Judge:

Defendant-appellant New Line Cinema Corporation ("New Line") appeals from two judgments of the United States District Court for the Southern District of New York (Motley, *J.*), each holding it in civil contempt for failing to comply with a consent decree between New Line and plaintiff-appellee Stephen King ("King"). Under the decree, New Line agreed not to use King's name in connection with the marketing of the film "The Lawnmower Man," and to take certain specified steps to eliminate references to King on the numerous videocassettes of the film already on the market. In March 1994, the district court found New Line in contempt for its failure to comply with various provisions of the decree, and ordered it to cure the contempt within thirty days. Subsequently, in February 1995, the district court again found New Line in contempt of its earlier order and the decree, imposed sanctions on New Line, and ordered New Line to take numerous steps to cure the contempt within thirty days.

New Line appeals from both orders of contempt, alleging that the district court erred in imposing obligations on New Line which were beyond the scope of the decree. Given New Line's clear failure to comply with various provisions of the decree, we conclude that the district court did not err in its 1994 Order in finding New Line in contempt. Nonetheless, we agree with New Line that one essential obligation imposed in the 1994 order—the obligation to ascertain how many copies of "The Lawnmower Man" each wholesaler and retailer held in their inventory—was beyond the scope of the decree and thus invalid. Therefore, we must also invalidate the order issued in 1995, as the court's finding of contempt was based entirely on New Line's failure to comply with the aforementioned provision. Accordingly, we affirm the judgment of the district court in part and vacate and remand in part.

## BACKGROUND

In 1970, King, the author of numerous best-selling horror novels, wrote a short story entitled "The Lawnmower Man," the movie rights to which defendant Allied Vision later obtained. Allied Vision, a British corporation, planned to distribute the film in the United States through its subsidiary New Line. During the film's production and prior to its release, King advised Allied Vision and New Line that he objected to the marketing of the film as "Stephen King's The Lawnmower Man." On May 28, 1992, several weeks after the film opened in theaters, King commenced an action in the district court, seeking injunctive and monetary relief from Allied Vision, Innovation Books, and New Line for allegedly misattributing King's name to the film "The Lawnmower Man." Although the district court entered a preliminary injunction prohibiting the use of King's name, this Court ultimately upheld the use by New Line of a "based upon credit" ("based upon a story by Stephen King"), but barred the use of a "possessory credit" ("Stephen King's The Lawnmower Man"). *See King v. Innovation Books,* 976 F.2d 824, 829 (2d Cir.1992).

On May 17, 1993, the parties voluntarily settled the action, pursuant to which they entered into a court-approved consent decree (the "Decree"). The Decree prohibited New Line and those associated with it from using King's name in any manner in connection with the film, and directed New Line to undertake certain corrective measures designed to eliminate King's name from "The Lawnmower Man" videocassettes in circulation at the time of the Decree's execution. The offending videocassette packages, hundreds of thousands of which were already in the marketplace, bore a "based upon credit" in large block letters on the front and in small print on the credit block on the back.

The corrective provisions of the Decree state in relevant part:

¶ 2. Each of the Defendants shall take immediate steps to provide by certified mail, return receipt requested ... a copy of this Final Consent Decree to all its respective licensees, distributors, succes-

sors and assigns embraced by the terms hereof, and all other persons or entities to which each of the Defendants has granted, or grants in the future, the right to engage in any of the commercial activities or forms of exploitation [prohibited by this Decree], accompanied by a letter of instruction ... which explains the terms of the Final Consent Decree, and demands assurance that they will, in all respects, abide thereby.

¶ 4. Each of the Defendants shall supply all of its wholesalers or others to which it has made distribution of videocassettes or other formats of the Motion Picture with package "paste-overs" or, alternatively, new packages on which the name of Stephen King is not displayed, and demand in a letter, sent by certified mail, ... which shall accompany the "paste-overs" and/or new packages being provided to said wholesalers or others that such entities affix the new "paste-over" covers onto the old packages or, alternatively, replace the old packages with the new packages, and further issue instructions to such entities to cease and desist from all advertising or promotion relating to the Motion Picture....

Paragraph 5 of the Decree provided that, in view of the mandates of ¶ 4, "no requirement is imposed upon Defendants to recall or withdraw" copies of the film already in the market. Under ¶ 6, New Line was required, within thirty days, to provide King with a written affidavit describing with particularity the efforts it undertook to comply with the Decree. Paragraph 7 of the Decree provided that the "failure by such third part[ies not associated with New Line] to ... abide by the provisions [of the Decree] shall not entitle King to seek to hold ... New Line ... in contempt of this ... Decree." Paragraph 8 of the Decree stated that inadvertent failures to comply would not constitute a violation of the Decree, provided that after notifying King, New Line promptly cured any noncompliance.

Several months after execution of the Decree, King returned to the district court seeking a civil contempt order for New Line's alleged failure to comply with the Decree. Following a hearing, the district court, by Memorandum Opinion dated March 25, 1994, found New Line in contempt.

The district court first cited numerous instances of noncompliance by New Line. With respect to ¶ 2, the district court found that New Line failed to take "immediate steps" to provide its licensees and distributors with a copy of the Decree and the required letter by certified mail, return receipt requested. Rather, New Line did not send the required materials until June 14, more than three weeks following the execution of the Decree.

With respect to ¶ 4, the district court cited the following instances of noncompliance: (1) New Line did not distribute corrective stickers for tapes in the existing inventories of wholesalers and retailers until July 7, 1993 (the "first mailing"); (2) the first mailing contained a paste-over sticker which covered only the small reference to King on the credit block, but did not include a sticker to eliminate the credit in large print on the front of the packaging; (3) although New Line learned of this problem on July 9, it did not correct the error until August 13 at the earliest, when it mailed new corrective sleeves to wholesalers and retailers (the "second mailing"); (4) New Line sent eight stickers to each retailer in the first mailing and ten new sleeves to each retailer in the second mailing, without making any effort to determine the number of stickers or sleeves each retailer might require; (5) the first mailing was made by third class mail, rather than certified mail; (6) New Line failed to send demand letters by certified mail asking the wholesalers and retailers to affix the new paste-over stickers or replace the old sleeves with the new sleeves; (7) the first mailing included a promotional letter that simply asked for cooperation, but neither referred to nor enclosed a copy of the Decree; and (8) the copy of the Decree ultimately enclosed with the second mailing did not include the page bearing the signature of the district court.

Additionally, the court concluded that the affidavits New Line submitted to King pursuant to ¶ 6 detailing its compliance efforts contained numerous false and misleading representations. Various New Line employ-

ees testified that they signed the affidavits prepared by counsel without actually knowing whether the activities described occurred. Several of the affidavits implied that New Line had undertaken greater and more comprehensive efforts than it actually had. For instance, one affidavit, executed on July 6, 1993, stated that New Line had sent new packages to its wholesalers and retailers to replace existing packages, when in fact corrected sleeves were not sent until mid-August.

The district court also rejected New Line's assertion that any noncompliance was inadvertent, in light of the two nearly month-long delays in effecting both the first and second mailings and of the apparent failure of New Line employees to examine carefully the contents of the mailings. Lastly, the district court referred to an informal investigation conducted by King at assorted video retail outlets nationwide, which revealed that sixty-seven of the seventy-six "The Lawnmower Man" videocassettes observed contained at least some proscribed reference to King.

Based upon these detailed findings, the district court found New Line in contempt of the Decree. First, the district court found New Line in contempt for its violations of ¶ 2 of the Decree, based on its failure to immediately send copies of the Decree to its distributors and licensees. As to ¶ 4, the district court found New Line in contempt based on the defective stickers distributed with the first mailing, its failure to enclose with the first mailing a letter instructing the recipients to comply with the Decree, and its failure, in effecting the second mailing, to attempt to determine the number of videocassettes in circulation.

The district court also rejected New Line's contention that under ¶ 4—which required New Line to "supply all of its wholesalers or others to which it has made distribution" with paste-over stickers or new sleeves—it was obliged only to send materials to its direct distributor Columbia Tri Star. The court reasoned:

New Line contends that the language of ¶ 4 "fully supports a finding that the consent decree clearly and unambiguously did *not* require New Line to send materials to

wholesalers and retailers but rather *only* to *either* its distributor Columbia Tri Star *or* its wholesalers." We agree. However, by clearly opting to supply both its wholesalers and others "to which it has made distribution" of the videocassettes, we find that it assumed the responsibility for a wholesale and retail distribution that fully complied with the terms of the consent decree. Accordingly, such distribution was required to be competently made, a finding that we cannot make based on the evidence presented (emphasis in original) (citation omitted).

The district court also found New Line in contempt of ¶ 6 because of the inadequacy of the affidavits provided by its employees to King.

As to the sanctions for New Line's contempt, the district court ordered as follows:

We understand that defendant will not be able to track every single copy of the Lawnmower Man videocassette to affix a sticker or replace a sleeve. However, its previous mailings were clearly no more than rough approximations designed to effectuate a "token" compliance with the terms of the Decree. Defendant has established no definite criteria for determining the number of proscribing videocassettes in the market, a task which was obviously necessary if it hoped to achieve any meaningful compliance. Accordingly, we hold that New Line must take any action necessary to cure the contempt at all wholesale and retail outlets within thirty days of this opinion.

In remedying this contempt, defendant is required to contact all entities to which it has distributed videocassettes and the previous mailings to determine their current inventory of the Lawnmower Man and whether the entities have received adequate corrective stickers to comply with the Decree. Defendant must then correct any deficiencies within this thirty day period. At the end of this period, plaintiff is entitled to conduct one final investigation to measure defendant's compliance and submit its findings to this court. If, based on those findings, this court finds that defendant has not substantially complied

with the aforementioned requirements, it will be required to pay a fine to plaintiff in the amount of $10,000 per day until its noncompliance is cured.

The district court also awarded King attorneys' fees and "any unlawful profits that defendant earned" from the sale or rental of "The Lawnmower Man" during its period of noncompliance in order to compensate King.

In an effort to cure the contempt and comply with the 1994 Order, beginning on April 7, 1994, New Line, through a mass mailing service, effected a distribution to 25,334 video retailers and 226 video wholesalers and distributors (the "third mailing"). The third mailing contained an inventory report form accompanied by a request that recipients complete and return the form either by fax or mail, but did not include a copy of the Decree. After receiving a response to the third mailing, New Line would distribute the appropriate number of corrective sleeves or stickers to the responding entity (the "fourth mailing"). The third mailing was sent by first class mail, mailings after April 19, 1994 were via either guaranteed two-day or overnight delivery, and mailings after April 25, 1994 were sent by Federal Express.

Few entities responded to the third mailing. Only thirteen percent of the 25,334 video retailers contacted responded, and only twenty-three percent of the 226 wholesalers and distributors contacted replied. Because New Line sent its fourth mailing only to those entities that responded to the third mailing, eighty-seven percent of retailers and sixty-seven percent of wholesalers and distributors remained unaffected by New Line's cure efforts. New Line did not attempt to reach any of this vast number of nonresponding retailers, wholesalers, and distributors.

At the completion of the thirty-day cure period, King conducted an investigation to determine the extent of New Line's compliance with the 1994 Order. The investigation revealed that New Line's compliance efforts had little effect at the retail level. Out of 111 total observed videocassettes, eighty-three (seventy-five percent) bore impermissible references to King. Moreover, none of the video store personnel questioned by the investigators knew of any request made by New Line regarding "The Lawnmower Man" videos.

Subsequent to this investigation, King again moved to hold New Line in contempt. On February 27, 1995, in its Opinion on Contempt Purging, the district court found New Line in contempt of both the Decree and the 1994 Order (the "1995 Order"), relying on the facts just set forth. The district court found that New Line violated ¶ 4 of the Decree by using first class mail, rather than certified mail, with respect to the third mailing. The district court also found New Line in contempt for failing to conduct any sort of follow-up as to the vast majority of distributors, wholesalers, and retailers which did not respond to the third mailing.

To cure the contempt, the district court imposed a variety of obligations on New Line. First, the district court required New Line to pay King a fine of $10,000 per day from the date of entry of the 1995 Order, until such time as its noncompliance was cured. Second, the court ordered New Line to contact by certified mail, return receipt requested all the entities that did not respond to the third mailing to determine whether they had adequate corrective stickers or sleeves to comply with the Decree, a copy of which was to be enclosed. The court also required New Line to contact by phone each entity that failed to respond to this mailing to determine how many corrective stickers each needed. New Line was afforded thirty days in which to cure its noncompliance, at which point King could conduct another market investigation. If the district court determined, based on this investigation, that New Line had not substantially complied with the aforementioned requirements, it would continue to impose the $10,000 per day fine payable to King and "order a complete recall of all videocassettes and laser discs of the Lawnmower Man in the possession of all retailers and distributors." The district court also awarded King attorneys' fees.

The district court stayed the 1995 Order pending appeal, which we granted on an expedited basis. New Line now appeals from both the 1994 Order and the 1995 Order.

## DISCUSSION

In analyzing a contempt order, we recognize that such an order is a "potent weapon," *International Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n,* 389 U.S. 64, 76, 88 S.Ct. 201, 208, 19 L.Ed.2d 236 (1967), to which courts should not resort "where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct," *California Artificial Stone Paving Co. v. Molitor,* 113 U.S. 609, 618, 5 S.Ct. 618, 622, 28 L.Ed. 1106 (1885). A contempt order is warranted only where the moving party establishes by clear and convincing evidence that the alleged contemnor violated the district court's edict. *See Hart Schaffner & Marx v. Alexander's Dep't Stores, Inc.,* 341 F.2d 101, 102 (2d Cir.1965) (per curiam). More specifically, a movant must establish that (1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner. *See New York State Nat'l Org. for Women v. Terry,* 886 F.2d 1339, 1351 (2d Cir.1989), *cert. denied,* 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990). A clear and unambiguous order is one that leaves "no uncertainty in the minds of those to whom it is addressed," *Hess v. New Jersey Transit Rail Operations, Inc.,* 846 F.2d 114, 116 (2d Cir.1988), who "must be able to ascertain from the four corners of the order precisely what acts are forbidden," *see Drywall Tapers, Local 1974 v. Local 530, Operative Plasterers Int'l Ass'n,* 889 F.2d 389, 395 (2d Cir.1989), *cert. denied,* 494 U.S. 1030, 110 S.Ct. 1478, 108 L.Ed.2d 615 (1990).

### 1. Propriety of the 1994 Order

Although review of the district court's findings of fact is for clear error, *see EEOC v. Local 580, Int'l Ass'n of Bridge, Structural and Ornamental Ironworkers,* 925 F.2d 588, 594 (2d Cir.1991), we review its interpretation of the Decree *de novo, see United States v. Local 1804–1, Int'l Longshoremen's Ass'n,* 44 F.3d 1091, 1095 (2d Cir.1995). A district court may not "expand or contract the agreement of the parties as set forth in the consent decree, and the ex-plicit language of the decree is given great weight." *Berger v. Heckler,* 771 F.2d 1556, 1568 (2d Cir.1985) (citation omitted). Because a decree is the sole source of the parties' rights, *see Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland,* 478 U.S. 501, 522, 106 S.Ct. 3063, 3075, 92 L.Ed.2d 405 (1986), a district court may not impose obligations on a party that are not unambiguously mandated by the decree itself, *see United States v. Armour & Co.,* 402 U.S. 673, 681–82, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971). At the same time, however, because a consent decree is a court-approved order, a district court has broad equitable discretion to enforce the obligations of the decree. *See Local 580,* 925 F.2d at 593. Accordingly, we must invalidate those portions of the contempt orders, if any, that were inconsistent with or beyond the scope of the Decree.

New Line claims that the 1994 Order imposed several obligations beyond the scope of the Decree. Although we will address each of New Line's arguments, several of which possess substantial merit, we conclude that the district court in its 1994 Order did not err in finding New Line in contempt of ¶¶ 2, 4, and 6 of the Decree.

### a. New Line's Noncompliance

First, the district court correctly criticized New Line for failing to conduct its ¶ 2 mailing to its distributors for more than three weeks after the entry of the 1994 Order. New Line contends that ¶ 2 only required it to take "immediate steps," without imposing a firm deadline. Whatever constitutes "immediate," it is certainly less than three weeks. Moreover, New Line's proffered explanation—that it did not learn of the execution of the Decree until June 10—was insufficient given that New Line received at least constructive notice of the Decree when notice was published in the *New York Law Journal* on May 20, 1993. The district court was therefore justified in finding that the three-week delay ran afoul of ¶ 2 of the Decree.

Nor did the district court err in finding New Line in contempt for its use of third class mail in connection with the first mailing pursuant to ¶ 4, rather than certified mail as

required by the Decree. Moreover, the district court correctly found that the first mailing contained defective stickers that did not eliminate the prominent possessory credit on the front of the package. In addition, the informal letter New Line sent with the first mailing did not comply with ¶ 4, which required New Line to demand that all entities "cease and desist [from activity] ... not in strict conformity with the ... Decree." Lastly, New Line clearly failed to comply with ¶ 6, given that it supplied King with false and misleading affidavits regarding its compliance with the Decree. Accordingly, the district court did not err in finding New Line in contempt of the Decree.

### b. Additional New Line Arguments

#### 1. Breadth of First Mailing

■ Despite concluding that New Line was in contempt, we consider two additional arguments regarding ¶ 4 of the Decree, as their resolution bears on the propriety of the 1994 and 1995 Orders. First, New Line argues that the Decree only required that it effect one mailing of paste-over stickers to Columbia Tri Star, its nationwide distributor, which then could have chosen to send the stickers to individual retailers without having to comply with the Decree. The relevant provision of ¶ 4 provided that New Line "shall supply all of its wholesalers or others to which it has made distribution" of the film with corrective stickers or packaging and a demand letter. New Line argues that simply because it voluntarily sent the stickers directly to its retailers, it did not "assume the responsibility" of providing the stickers in full compliance with the terms of the Decree, as the district court concluded.

■ We disagree with the district court's conclusion that ¶ 4 "clearly and unambiguously" required New Line to send materials only to either its wholesalers or Columbia Tri Star. It is not clear from the Decree itself whether "others to which it has made distribution" refers to New Line's direct distributor or to those to which it made indirect distribution, that is, retailers. Where, as here, a term of a consent decree is ambiguous, a court may consider extrinsic evidence to ascertain the parties' intent, including the

circumstances surrounding the formation of the decree. *See United States v. O'Rourke,* 943 F.2d 180, 187 (2d Cir.1991). Where all the relevant extrinsic evidence is on the appellate record, we may determine for ourselves the parties' intent. *See United States Fire Ins. Co. v. General Reins. Corp.,* 949 F.2d 569, 574 (2d Cir.1991).

It is not obvious from the available extrinsic evidence precisely what the parties intended. On one hand, King rejected New Line's proposal to insert the word "direct" before "distribution," which implies that the parties ultimately agreed upon a broad distribution. This interpretation is bolstered by New Line's own conduct which suggests that it viewed ¶ 4 as obligating it to distribute corrective materials to retailers. New Line's outside general counsel, on the other hand, testified that he agreed not to include the word "direct" because King's counsel "convinced [him] that it was a superfluous and redundant word, that everyone's understanding was very clear that New Line's obligation was not to make distribution ... to anyone other than the parties with whom it was in privity, namely, Columbia [Tri Star]."

Regardless of the resolution of this issue, we conclude that the district court did not err in concluding that New Line, having sent the corrective mailings to its wholesalers and retailers, "assumed the responsibility" of complying with the Decree. Paragraph 4 clearly requires New Line to send corrective materials and a detailed demand letter by certified mail to some entity, whether Columbia Tri Star, its wholesalers, or retailers. New Line may have opted for the more difficult course of distributing to the retailers, but that does not excuse its failure to comply with the unambiguous requirements contained in ¶ 4. Under New Line's interpretation, it could have avoided any of its specific obligations simply by effecting a more extensive mailing than required.

Contrary to New Line's assertion, by concluding that New Line assumed the responsibility of complying with ¶ 4 as to the retailers, the district court did not impose additional obligations beyond the scope of the Decree. The district court did not find New Line in contempt for failing to send materials

to the retailers in the first instance; instead, it found New Line in contempt for failing to comply with ¶ 4 with respect to those entities to which it decided to send corrective materials. The district court's conclusion that New Line assumed this responsibility was within its equitable discretion to enforce compliance with the Decree. *See United States v. Local 359, United Seafood Workers*, 55 F.3d 64, 68–69 (2d Cir.1995); *Local 580*, 925 F.2d at 593 ("[w]here equitable remedies which exceed the confines of the consent judgment are reasonably imposed in order to secure compliance of the parties, the court has not overstepped its bounds").

### 2. Determining Retailer Inventory

■ Second, New Line argues that the district court erred when it found New Line in contempt for failing to establish "definite criteria for determining the number of proscribing videocassettes in the market, a task which was obviously necessary if it hoped to achieve any meaningful compliance." More specifically, the court criticized New Line for failing to undertake any "effort ... to determine how many stickers or sleeves each retailer might actually require [or] any effort ... to determine how difficult it might be to obtain that information in connection with either the first or second mailings." In what the district court characterized as "token compliance," New Line roughly divided the approximate number of tapes in circulation (250,000) by the number of retailers it was contacting (25,000), and accordingly sent eight new stickers to each retailer in its first mailing and ten sleeves in the second mailing. To remedy the contempt, the court ordered New Line "to contact all entities to which it has distributed videocassettes and the previous mailings to determine their current inventory of the Lawnmower Man and whether the entities have received adequate corrective stickers to comply with the Decree."

New Line claims that the Decree does not obligate it to take such steps. To be sure, the Decree does not expressly require New Line to contact each retailer to determine its inventory of "The Lawnmower Man." Instead, the district court viewed the requirement as implicit in the Decree, a primary purpose of which was to eliminate references to King on videotapes at the retail level. As the Supreme Court has noted, however, "the *decree* itself cannot be said to have a purpose; rather the *parties* have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve." *Armour*, 402 U.S. at 681–82, 91 S.Ct. at 1757.

Although ¶ 4 contains a number of detailed provisions, it does not specifically require New Line to ascertain the inventory of each entity to which it mailed corrective materials. The absence of the requirement may have resulted from King's failure in negotiating for such a term, or perhaps even the failure to request such a term altogether. Whether or not such efforts by New Line would have better achieved King's purposes is not the relevant focus; rather, the inquiry is whether such a requirement is contained within the "four corners" of the Decree. *Id.* at 682, 91 S.Ct. at 1757.

The district court's position might have had merit had New Line, for instance, sent only one sticker or sleeve to each retailer. Even in absence of an express requirement to ascertain each retailer's inventory, such a futile attempt at compliance would constitute bad faith, for which the district court could properly hold New Line in contempt. By contrast, although the procedure New Line used resulted in most retailers receiving either too many or too few corrective materials, it was hardly employed in bad faith. As New Line's director of videotape distribution testified, "given the time constraints I had, the instructions I got [to] get it out as soon as possible ... [and] based on the resources available to me readily ..., this [was] the best that I could do." Without a showing of bad faith, there is no basis in the Decree upon which the district court could find New Line in contempt for failing to determine with greater specificity the inventory of each retailer.

Because the requirement of determining retailer inventory prior to mailing the corrective materials was beyond the scope of the

Decree, it follows that the district court erred in finding New Line in contempt for failing to undertake such efforts. As New Line was not in contempt on this basis, it also follows that the district court erred in the 1994 Order when it ordered New Line to ascertain the inventory of each retailer and ensure that each received an adequate amount of corrective materials within thirty days. Accordingly, the 1995 Order is invalid as well, as it was issued based on New Line's failure to comply with that portion of the 1994 Order as to which we are reversing. All of the district court's findings of noncompliance in the 1995 Order related to New Line's effort to determine retailer inventory. Of course, as described above, the district court did not err in the 1994 Order by finding New Line in contempt of the Decree on the grounds of its noncompliance with ¶¶ 2 and 6, and assorted other provisions of ¶ 4.

Even assuming, however, that the district court properly found New Line in contempt for failing to determine with specificity the number of tapes each retailer possessed, many of the other obligations the court imposed in the 1995 Order were clearly beyond the scope of the Decree. We briefly address those provisions of the 1995 Order that we would invalidate even if we affirmed the district court's 1994 finding of contempt in its entirety, as this discussion may assist the district court on remand.

**2. Propriety of the 1995 Order**

New Line argues that the district court erred in 1995 by finding it in contempt for failing to take steps that were not required by either the Decree or the 1994 Order. As set forth above, the district court in the 1994 Order required New Line to contact all those to whom it previously distributed corrective materials, determine their inventory of "The Lawnmower Man" tapes, and correct any deficiencies within thirty days. King would then conduct a final investigation designed to measure New Line's compliance. In the 1995 Order, the district court found New Line in contempt for failing to cure its contempt of the Decree in accordance with the 1994 Order. Specifically, the district court faulted New Line for not using certified mail,

return receipt requested to effect the third and fourth mailings, for failing to enclose a copy of the Decree with those mailings, and for failing to conduct any sort of follow-up with respect to the large majority of retailers and wholesalers that did not respond to the third mailing.

To remedy the contempt, the district court ordered New Line to contact by certified mail, return receipt requested all entities that did not respond to the third mailing in order to determine their inventory and to provide all those entities with a copy of the Decree. New Line was then ordered to contact by phone all the entities that did not respond to the fourth mailing. If, based on King's investigation after thirty days, the court was not satisfied that New Line substantially complied, it would order a recall of all copies of "The Lawnmower Man." The district court then ordered New Line to pay King a fine of $10,000 per day from the date of entry of the opinion until its noncompliance was cured, and awarded King attorneys' fees. Against this background, we consider the validity of certain aspects of the 1995 Order, were it to stand.

**a. Obligations Beyond the Scope of the Decree**

■ New Line first claims that the 1994 Order only required it to "contact" the retailers, without specifying certified mail, return receipt requested. New Line argues that "contact" does not mean certified mail, and no evidence exists that certified mail would have achieved better response results. We reject this argument. The 1994 Order instructed New Line to take steps to cure its contempt, which was based in part on its failure to use certified mail in connection with its ¶ 4 mailing. New Line improperly reads the word "contact" in isolation without reference to the 1994 Order. The failure to use certified mail was a clear violation of the 1994 Order. Moreover, we need not address New Line's argument about the effectiveness of certified mail as opposed to other means. King explicitly bargained for certified mail, apparently because he thought it would more effectively capture retailers' attention than would bulk mailings. Nonetheless, the dis-

trict court did err in ordering the use of certified mail, return receipt requested; ¶4 required only the use of certified mail.

■ New Line next argues that the 1994 Order did not require it to enclose a copy of the Decree in its mailings to the retailers. New Line is entirely correct. Paragraph 4 contains no requirement that New Line enclose a copy of the Decree in its mailings. The district court confused the mandates of ¶¶ 2 and 4, as it did when it ordered the ¶ 4 mailings to be made by certified mail, return receipt requested.

■ In addition, New Line is correct in arguing that the district court erred in ordering it to contact by phone each retailer that did not respond to the certified mailing. This requirement is well beyond the scope of the Decree, which only required New Line to distribute mailings, without mentioning telephone contact in any provision. Moreover, this requirement also contravenes ¶ 7 of the Decree, which provides that the "failure by ... third part[ies] to ... abide by the provisions ... shall not entitle King to seek to hold either Allied and/or New Line ... in contempt...."

Moreover, one could interpret the 1994 Order to require follow-up after follow-up until all videotapes on the market were properly labelled, all within thirty days of the entry of the opinion. According to the 1995 Order, the district court would measure New Line's compliance based on King's investigation of retailers, over whom New Line ultimately retains little if any control. Because nothing in the Decree explicitly requires such extensive follow-up and because ¶ 7 precludes King from holding New Line responsible for retailer noncompliance, we conclude that the 1995 Order is overly broad on this point.

■ New Line also contests the district court's authority to order a recall. Paragraph 5 of the Decree states that "no requirement is imposed upon [New Line] to recall or withdraw from the market videocassettes or other formats" of the movie that were in circulation as of the date of execution of the Decree. Although the district court could properly hold New Line in contempt for as long as it declines to effect a proper

¶ 4 mailing, it could not, by ordering a recall, hold New Line responsible for those retailers and wholesalers who, after receiving a certified mailing, decline to respond or to alter the tapes in their possession. Accordingly, the recall provision of the 1995 Order is clearly beyond the scope of the Decree as well.

### b. Payment of Fines to King

■ Next, New Line challenges the $10,000 per day fine payable to King, which it argues is simply punitive in nature. *See Manhattan Indus. v. Sweater Bee by Banff, Ltd.,* 885 F.2d 1, 5 (2d Cir.1989), *cert. denied,* 494 U.S. 1029, 110 S.Ct. 1477, 108 L.Ed.2d 614 (1990). Relatedly, it contends that King himself should not receive any fine paid because the fine bears no relation to any damages actually incurred by King. A civil contempt sanction should either seek to "coerce the contemnor into future compliance with the court's order or to compensate the complainant for losses resulting from the contemnor's past noncompliance." *Terry,* 886 F.2d at 1352. The district court has broad discretion in fashioning coercive remedies. *See N.A. Sales Co. v. Chapman Indus. Corp.,* 736 F.2d 854, 857 (2d Cir.1984). There is no question that the $10,000 per day fine was in large part coercive; rather, the difficult issue is whether the district court should have awarded the fine to King.

■ The district court abused its discretion by awarding King the fines it imposed under both the 1994 and 1995 Orders. "[S]ome proof of loss must be present to justify [a fine's] compensatory aspects." *Terry,* 886 F.2d at 1353–54 (absent proof of loss, fine is payable to court). The rule that sanctions such as fines can be paid directly to plaintiffs who present some proof of loss, *see id.,* implies that the sanction should correspond at least to some degree with the amount of damages. Moreover, the district court had already awarded King net profits from the sale or rental of "The Lawnmower Man" in the 1994 Order to compensate King. *See Sweater Bee,* 885 F.2d at 6 (profits derived by the contemnor from violation of a court order are "'an equivalent or a substitute for legal damages,' when damages have

not been shown, and are recoverable 'not by way of punishment but to insure full compensation to the party injured' ") (quotations omitted).

In the instant case, the $10,000 per day fine is wholly unrelated to any damages King may have incurred due to New Line's noncompliance with the Decree. Moreover, to award the fine to King as compensation is redundant, given the award of net profits as a measure of King's damages. In summary, because "no proof of loss was offered on behalf [of King], no evidence of actual injury due to [New Line's] activities was shown and there was no evidence that awarding the contempt sanction to [King] would have additional coercive effect on defendant's behavior," the district court abused its discretion in awarding the fines to King. *Terry,* 886 F.2d at 1354.

### c. Attorneys' Fees

We are also troubled by the district court's award of attorneys' fees to King. In order to award fees, the district court had to find that New Line's contempt was willful. *See Sweater Bee,* 885 F.2d at 8; *Vuitton et Fils S.A. v. Carousel Handbags,* 592 F.2d 126, 130 (2d Cir.1979). We review an award of attorneys' fees for an abuse of discretion. *See McGuire v. Russell Miller, Inc.,* 1 F.3d 1306, 1313 (2d Cir.1993). Although New Line may have been careless in attempting to comply with certain portions of the Decree and the 1994 Order, we are reluctant to conclude that the noncompliance was willful. New Line undertook substantial efforts to comply with both the Decree and 1994 Order by conducting four separate mailings in which it distributed hundreds of thousands of corrective stickers and sleeves. Moreover, we consider New Line's noncompliance in light of the ambiguous portions of the Decree, including the uncertainty as to which entities were to receive corrective materials. Although we need not resolve this issue at this juncture, on remand the district court may wish to reconsider whether an award of attorneys' fees remains appropriate in light of our decision to vacate much of the 1994 Order and the entirety of the 1995 Order.

### CONCLUSION

Based on the foregoing, we affirm the 1994 Order insofar as the district court found New Line (1) in contempt of ¶¶ 2 and 6, and (2) in contempt of ¶ 4 to the extent that New Line failed to use certified mail in its mailings and, in connection with the first mailing, sent defective stickers and an inadequate demand letter. We vacate that portion of the 1994 Order in which the district court ordered New Line to contact all of its retailers to determine their inventory of the film. Furthermore, we vacate the 1995 Order in its entirety, as that finding of contempt was based on New Line's failure to comply with the aforementioned portion of the 1994 Order. Accordingly, we affirm in part, and vacate in part and remand for proceedings consistent with this decision.