Joseph **TOURANGEAU, Molly Cobbol, Robert Lowell and Robert Frank,** on behalf of themselves and all others similarly situated, **Plaintiffs–Appellees– Cross–Appellants,**

v.

**UNIROYAL, INC., Defendant–Appellee,**

Joseph F. **Flannery,** individually and as **Chief Executive Officer and Director of Uniroyal, Inc.; William J. Palmer, Thomas W. Clark, Norma R. Sullivan, Alan R. Elton, Ronald H. Hawkins and Frank J. Longto,** individually and as **members of the Uniroyal Board of Benefits and Awards, Defendants,**

**Michelin North America, Inc. (formerly Uniroyal Goodrich Tire Company, Inc.) Respondent–Appellant–Cross–Appellee.**

**Nos. 1807, 2086 and 2102, Dockets 96–7103, 96–7149 and 96–7483.**

United States Court of Appeals, Second Circuit.

Argued June 28, 1996.

Decided Dec. 3, 1996.

Wayne C. Dabb, Jr., Cleveland, OH (John J. McGowan, Jr., Baker & Hostetler, Cleveland, OH, Frank J. Silvestri, Jr., Beverly Stauffer Knapp, Zeldes, Needle & Cooper, Bridgeport, CT, of counsel), for Respondent–Appellant–Cross–Appellee.

Daniel M. Abuhoff, New York City (John H. Hall, Debevoise & Plimpton, New York City, of counsel), for Defendant–Appellee Uniroyal, Inc.

Seth M. Kupferberg, New York City (I. Philip Sipser, Sipser, Weinstock, Harper & Dorn, New York City, of counsel), for Plaintiffs–Appellees–Cross–Appellants.

Before: MINER, JACOBS and PARKER, Circuit Judges.

PARKER, Circuit Judge:

This case presents three main issues: (1) whether, under the unusual circumstances presented, a successor in interest to a litigating party is bound by the terms of an agreement which settled that litigation even though the successor was not a formal participant in the litigation; (2) if the settlement agreement does bind the successor in interest, whether, absent a showing of plaintiff-specific cost increases, the agreement forbids the successor from increasing the rates plaintiffs, a class of retirees, must pay to receive certain retirement benefits; and (3) whether the settlement agreement provides for awarding fees to plaintiffs' counsel for their efforts to enforce the settlement agreement in this action. The United States District Court for the District of Connecticut (Alan H. Nevas, *Judge*) answered the first two questions "yes" and the third question "no." We affirm as to the first question, reverse as to the second and third questions, and remand.

## I. BACKGROUND

### A. *Overview*

Before discussing the facts in chronological detail, a brief overview is in order. In the mid 1980s, Uniroyal, Inc. (hereafter "Uniroyal") restructured in order to combat the threat of a hostile takeover and to facilitate a friendly takeover of the company. As part of the restructuring, Uniroyal created and incorporated five wholly owned subsidiaries. These subsidiaries were a holding company and four operating companies that corresponded with Uniroyal's various businesses which had previously operated as unincorporated divisions of Uniroyal. One such subsidiary, Uniroyal Tire Company (hereafter "Tire"), assumed operation of Uniroyal's tire business in 1985. About a year later, Uniroyal transferred Tire to a partnership owned in part by Uniroyal and in part by another company, Goodrich. The name of the partnership was Uniroyal–Goodrich Tire Company (hereafter "UGTC").[1]

Aware of the changes going on at their former employer, a class of Uniroyal retirees brought suit against Uniroyal in the United States District Court for the District of Connecticut seeking a declaratory judgment (1) that their retirement welfare benefits (i.e., medical and life insurance) could not be terminated or reduced without their consent, and/or (2) that federal law required Uniroyal to establish a separate fund to cover the

---

1. UGTC has since been recapitalized, incorporated and acquired by Michelin North America, Inc.

For convenience, we refer to UGTC and its successors as "UGTC."

expenses of providing such benefits. Only Uniroyal was named as a defendant. This litigation was ultimately settled in a settlement agreement and approved by the court in a consent judgment.

The litigation described in the above paragraph will hereafter be referred to as the "underlying litigation." The controversy before us now stems from an action to enforce the settlement agreement which was the outcome of the underlying litigation.

Both prior to and during the pendency of the underlying litigation, Tire assumed many of Uniroyal's commitments and liabilities, including those relating to the retirement benefits of Uniroyal retirees assigned to Tire (hereafter "Tire retirees") (generally persons whose employment related to the business operations which Tire assumed).

## B. *Chronology*

The following chronology details the parallel paths of corporate restructuring and litigation which gave rise to this action seeking to enforce the settlement agreement.

On October 27, 1985, Uniroyal spun off its tire business into Uniroyal Tire, a separately incorporated subsidiary of another just-created spin-off, Uniroyal Holding Co., which was created solely to own stock of Tire. Tire and Uniroyal executed an Assumption of Liabilities and Indemnification Agreement (hereafter "Assumption Agreement"), which said that Tire assumes:

the obligations and liabilities of UNIROYAL, Inc., ... existing as of October 27, 1985 and at any time thereafter, of every kind and description relating to (*i*) the business conducted by Uniroyal within the Tire and Related Products Segment ... whether accrued, absolute or contingent, or whether in existence on the date hereof or arising hereafter....

Tire specifically assumed liabilities "which may arise under any ... pension, postretirement, health, accident, disability and survivor benefit plans or programs." Tire also agreed to indemnify Uniroyal "from and against any

and all losses, liabilities, claims, damages, costs and expenses ... arising out of or related, or purporting to be related, in any manner to the obligations and liabilities hereby assumed by Tire."

The Assumption Agreement also explained that if Uniroyal is sued in a way that implicates both matters for which Tire will indemnify and matters for which Tire will not indemnify, then Uniroyal can conduct the defense of that action, and settle it in good faith.[2] Specifically, the Assumption Agreement said that Uniroyal "shall be entitled ... to undertake, conduct and control ... the settlement or defense of such action or claim."

On June 19, 1986, plaintiffs, a class of retired Uniroyal employees, started the underlying litigation by filing suit under the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001–1461 (hereafter "ERISA"), against Uniroyal in response to Uniroyal's liquidation. The complaint also alleged state law counts of breach of contract and breach of fiduciary duty. Plaintiffs sued to maintain lifetime medical and other benefits. The Tire subsidiary was not joined as a defendant in the underlying litigation.

On July 31, 1986, Tire and Uniroyal restated the assumptions contained in the October 1985 Assumption Agreement in a "Rescission and Restatement Agreement."

On August 1, 1986, Tire entered into a joint venture, becoming a partner in the UGTC partnership. The "Joint Venture Agreement" created a partnership that "assume[d] all liabilities of Uniroyal relating to the Uniroyal Tire Business and ... indemnif[ied] Uniroyal with respect to the liabilities assumed by the Partnership ... as set forth ... in the Uniroyal Assumption Documents."

The Assumption Documents delivered pursuant to the above-quoted language stated that UGTC agreed to

pay, perform and discharge ... all obligations and liabilities associated with ... any past employees of Uniroyal ... who were, at the time of their retirement or

---

**2.** The underlying litigation was such an action because the retirees/plaintiffs came from all of Uniroyal's former divisions and not just Tire.

This provision reflects Uniroyal's desire to avoid conflicting representations regarding litigation affecting more than one of its former divisions.

termination, employed in connection with the Uniroyal Tire Business ... including without limitation those obligations and liabilities which may arise ... under any pension, postretirement, health, accident, disability and survivor benefit plans or programs, whether or not such plans or programs have been terminated, and all other employment-related claims of Uniroyal.

Elsewhere in the Assumption Documents the new partners agreed that

NOTWITHSTANDING ANY OTHER PROVISION OF THIS ASSUMPTION OF LIABILITIES AND INDEMNIFICATION AGREEMENT, this ... Agreement is not intended to expand the scope of any liabilities assumed hereunder or to create any Partnership liabilities that Uniroyal or the Parent did not previously have, and the Partnership does not intend hereby to undertake any liability or obligation of any Person other than Uniroyal.

The Uniroyal disclosure schedule which Tire submitted as part of the Joint Venture Agreement contained a paragraph describing the underlying litigation which, while noting that "none of Uniroyal's subsidiaries is a defendant in the action," concluded "[i]t is impossible to determine at this point what, if any, relief the court might order in this action." Furthermore, the disclosure schedule also said that the pending litigation was "likely ... to affect materially and adversely the Uniroyal Tire Business as conducted as of the date of the Joint Venture Agreement."

On November 14, 1986, the UGTC director of employee benefits was deposed. She testified that UGTC "had assumed the responsibility for benefits for retired employees from Uniroyal's Tire division."

On December 1, 1986, plaintiffs and Uniroyal signed a "Settlement Agreement" to end the underlying litigation. The Agreement provided as follows, at paragraph sixteen:

### VESTING OF WELFARE BENEFITS

16. (a) Uniroyal agrees to pay benefits to Eligible Retirees at the level provided for on the date the Action was commenced,

under the Benefit Plans consisting of (i) the Comprehensive Medical Plan, (ii) the Prescription Drug Plan and (iii) the life insurance plan, each as described in the summary booklets attached hereto as Exhibits 1A to 1F and agrees that neither it nor its successors, assigns or indemnitors shall terminate or materially reduce the level of benefits provided under the terms or conditions of the Plans.

The summary booklet corresponding to the Comprehensive Medical Plan, which was attached to the Settlement Agreement and incorporated by the above-quoted paragraph, detailed that a single retiree does not pay premiums, a married retiree pays fifteen dollars per month, and a retiree with more than one dependant pays thirty dollars per month for the benefits described in the booklet. The plan also said "PLEASE NOTE: These rates are subject to change in accordance with plan experience and medical cost escalation." The Settlement Agreement did not define "level of benefits."

The Settlement Agreement also stated that it did not modify the Assumption Agreement between Tire and Uniroyal.

Paragraph twenty-three of the Settlement Agreement provided that the district court would maintain authority and jurisdiction to enforce the Settlement Agreement. Furthermore, the district court "may, in accordance with the provision of 29 U.S.C. § 1132(g)(1) (1982), allow a reasonable attorney's fee to any party in connection with any motion to enforce the terms of this Settlement Stipulation."

On December 30, 1986, during a hearing on the Settlement Agreement, two members of the plaintiff class were represented by counsel who was trying to determine the scope of the Settlement Agreement so as to advise his clients whether to opt out of the Settlement Agreement. One of the chief concerns of this lawyer was whether the Agreement bound Uniroyal's successors. The lawyer asked Judge Nevas whether his ruling (approving the settlement) would "be binding on [Uniroyal's successors] as a matter of law, in their absence ... ?" Judge Nevas responded: "I'm not going to say or

do anything today that's binding on anybody or make my ruling or finding that's binding on any party, that's not a party to this lawsuit." [3]

On March 3, 1987, the district court approved the settlement, issuing the "Consent Judgment." In its decision approving the settlement, the court states that UGTC "assumed the employee and retiree benefit obligations that Tire had previously assumed from Uniroyal," and that Tire had "responsibility for retiree benefit liabilities and ... indemnif[ied] Uniroyal against any liability arising from failure to pay such benefits." The district court's opinion concluded by saying the plaintiffs "now have vested medical and drug plan benefits and life insurance coverage that will not be terminated or materially reduced during their lives."

In 1989, UGTC was acquired by Michelin North America, Inc. and became UGTC, Inc. Everyone agrees that UGTC, Inc. or Michelin is responsible for UGTC's previous liabilities (the dispute focusing on whether Tire assumed Uniroyal's duties and whether UGTC assumed Tire's responsibilities). As indicated above, see footnote 1, this opinion will continue to refer solely to UGTC.

In October 1994, UGTC decided to increase the monthly rates it charges to provide welfare benefits to the Tire retirees. The increases amount to between $120 and $300 per year, depending on the number of dependents each retiree has under the plan.

In January 1995, the Tire retirees, a subset of the original plaintiff class, moved the district court to enforce the Consent Judgment and enjoin the rate increase, arguing that the rate increase is a violation of the Consent Judgment.

In February 1995, Sheldon Salzman, who had been the President of Tire, and was then the Chief Operating Officer of UGTC, declared in an affidavit that when the settlement was reached and approved in late 1986 and early 1987, "I considered the UGTC Partnership to be bound by the settlement's terms." He further stated in this affidavit that he was aware of the underlying litigation, having reviewed the complaint and having been a witness in a preliminary injunction hearing in July 1986.

In April 1995, the district court (1) ruled that the Consent Judgment binds UGTC and (2) preliminarily enjoined UGTC from increasing rates.

In August 1995, this court vacated the preliminary injunction, ordering the district court to reconsider the preliminary injunction or to resolve the merits of plaintiffs' motion to enforce the Consent Judgment. Our summary order stated that we were not then reviewing the district court's decision that UGTC is bound by the Consent Judgment.

In December 1995, the district court ruled that "the consent judgment itself cannot be fairly read to bar an increase in the cost [to the retirees] of coverage ... [,] so long as the proposed increase was justified by medical cost escalation and plan experience in providing healthcare benefits to the *Tourangeau* plaintiffs."

On January 3, 1996, plaintiffs moved the district court to award attorney's fees pursuant to paragraph twenty-three of the Settlement Agreement.

On April 11, 1996, the district court denied plaintiffs' motion for an award of attorney's fees.

UGTC took this appeal from the April 1995 ruling that UGTC is bound by the Consent Judgment and from the December 1995 ruling that the Consent Judgment requires UGTC to provide plan experience justification before imposing premium increases on the class of retirees represented in this litigation. The retirees cross-appealed from the part of the December ruling that suggests "cost escalation and plan experience" may justify a premium increase. The retirees also cross-appealed from the district court's April 1996 decision not to award attorney's fees.

---

3. Judge Nevas interpreted this statement eight years later when he held that UGTC is bound by the consent judgment. Judge Nevas explained he was making no ruling regarding what judges presiding over other litigation would hold regarding the liability of successor organizations. We see no reason to disagree with Judge Nevas' interpretation of his own statements.

Uniroyal appears in these proceedings urging affirmance on the issue of the Consent Judgment's authority over UGTC. Uniroyal does not enter the fracas regarding whether the Consent Judgment authorizes a rate increase or the award of attorney's fees.

## II. DISCUSSION

### A. *The Reach of the Consent Judgment*

#### 1. *Standard of Review*

 The standard an appellate court employs in reviewing a decision to extend the reach of a Consent Judgment to a nonparty will depend on the nature of the underlying decision. Because the district court here based its ruling on the meaning of the written agreements between Uniroyal, Tire, and UGTC, our review focuses on the correctness of the district court's interpretation of those agreements. We typically review a district court's interpretation of an ambiguous contract for clear error, *see, e.g., United States Naval Inst. v. Charter Communications, Inc.,* 875 F.2d 1044, 1049 (2d Cir.1989), and review the district court's conclusion regarding whether a contract is clear or ambiguous *de novo, see, e.g., Seiden Assocs. v. ANC Holdings, Inc.,* 959 F.2d 425, 429 (2d Cir. 1992). In this case, Judge Nevas concluded that the various agreements between Uniroyal, Tire, and UGTC caused UGTC to be bound by the Consent Judgment. In so concluding, the district court appears to have concluded the terms of the writings were clear. Accordingly, we review the district court's ruling *de novo.*[4]

#### 2. *Review*

 UGTC argues that it was deprived due process when Judge Nevas ruled that the consent decree bound UGTC. The general rule is commonsensical: a party must consent to a consent decree before that decree can be enforced against that party. *Madison Square Garden Boxing, Inc. v. Shavers,* 562 F.2d 141, 143 (2d Cir.1977). Typically, such consent is manifest by participation in the litigation that gave rise to the settlement.

Here, however, UGTC did not participate in the underlying litigation. UGTC understandably emphasizes this fact. This fact, however, does not extinguish the reality that Tire (and UGTC) agreed to be bound by the outcome of the underlying litigation. Consent to be bound by a settlement agreement can be shown by means other than by participating in the underlying litigation. As the district court recognized, the relationship of a nonparty to those participating in the litigation can result in the nonparty being bound by the result of the litigation. *See Expert Elec., Inc. v. Levine,* 554 F.2d 1227, 1233 (2d Cir.) ("Generally speaking, one whose interests were adequately represented by another vested with the authority of representation is bound by the judgment, although not formally a party to the litigation."), *cert. denied,* 434 U.S. 903, 98 S.Ct. 300, 54 L.Ed.2d 190 (1977).

UGTC argues that the cases cited above are of questionable continued validity in light of more recent Supreme Court decisions, specifically *Richards v. Jefferson County,* —— U.S. ——, 116 S.Ct. 1761, 135 L.Ed.2d 76 (1996), *Martin v. Wilks,* 490 U.S. 755, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989), and *International Assoc. of Firefighters v. City of Cleveland,* 478 U.S. 501, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986). UGTC also claims that this court's opinion in *Association for Retarded Citizens v. Thorne,* 30 F.3d 367 (2d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 727, 130 L.Ed.2d 631 (1995), dictates that the older cases cited in the previous paragraphs are no longer good law. As discussed briefly below, the cases on which UGTC relies fail to support UGTC's argument.

In *Richards,* for example, the Supreme Court, while restating the general rule that one must be a party to a litigation to be bound by the results of that litigation, also reaffirmed that persons in privity with a litigating party may be bound by the judgment binding upon the litigating party. —— U.S. at ——, 116 S.Ct. at 1766. Furthermore, "although there are clearly constitutional limits on the 'privity' exception, the

---

**4.** We note, however, that the deposition testimony described in the above chronology provides ample evidence to support the district court's interpretation of these agreements (assuming the district court found the writings to be unclear so as to require reference to extrinsic evidence).

term 'privity' is now used to describe various relationships between litigants that would not have come within the traditional definition of that term. *See generally* Restatement (Second) of Judgments, ch. 4 (1980)." *Id.* Looking generally, as the Court directs us, to chapter four of the Restatement (Second) of Judgments, we see that "[a] person who agrees to be bound by the determination of issues in an action between others is bound in accordance with the terms of his agreement." Restatement (Second) of Judgments § 40 (1980).

The relevant inquiry is thus whether UGTC has agreed to be bound by the Consent Judgment's determination of issues. The answer to this question is found in the various documents quoted above. On October 27, 1985, and again on July 31, 1986 (over a month after plaintiffs initiated this law suit), Tire, UGTC's predecessor, expressly authorized Uniroyal to defend and settle litigation which implicated liabilities Tire had assumed and for which Tire had agreed to indemnify Uniroyal. Furthermore, as the August 1, 1986, Assumption Documents make clear, UGTC assumed the retirement obligations Tire assumed from Uniroyal.

The other cases which Uniroyal claims support its position are distinguishable: those cases do not involve the consent of a nonparty to be bound by the terms of a litigation settlement agreement. Indeed, in *Firefighters,* the Supreme Court explained that "it is the agreement of the parties, rather than the force of the law upon which the complaint was originally based, that creates the obligations embodied in a consent decree." 478 U.S. at 522, 106 S.Ct. at 3075. Here, Uniroyal and plaintiffs did agree to the Consent Judgment. Uniroyal and UGTC's predecessor agreed that UGTC's predecessor would be bound by the outcome of the underlying litigation.[5]

When Uniroyal incorporated Tire, Tire agreed to assume Uniroyal's obligations "whether accrued, absolute or contingent, or whether in existence on the date hereof or arising hereafter." In light of this assumption, and Tire's agreement that Uniroyal was authorized to settle this litigation, it is not at all unfair that Tire (and thus UGTC) be held to the Settlement Agreement which it had authorized Uniroyal to negotiate and enter into. Especially considering that UGTC had actual notice of this litigation, there is no due process violation in holding UGTC bound by the Settlement Agreement.

### B. *The Interpretation of the Consent Judgment*

#### 1. *Standard of Review*

 We review a district court's interpretation of a settlement agreement *de novo, King v. Allied Vision, Ltd.,* 65 F.3d 1051, 1058 (2d Cir.1995), mindful that the consent decree is a contract between the parties, and should be interpreted accordingly, *see United States v. ITT Continental Baking Co.,* 420 U.S. 223, 236–37, 95 S.Ct. 926, 934–35, 43 L.Ed.2d 148 (1975) (noting that consent judgments are to be construed as contracts). Furthermore, "a district court may not impose obligations on a party that are not unambiguously mandated by the decree itself." *King,* 65 F.3d at 1058.

#### 2. *Review*

 The district court concluded that the Consent Judgment "cannot be fairly read to bar an increase in the cost of coverage for the Comprehensive Medical Plan," so long as any such increase was justified by medical cost escalation and plan experience in providing benefits. We agree. As Judge Nevas put it:

> By expressly incorporating the Comprehensive Medical Plan's summary plan description into the Stipulation of Settlement and by failing to define the term "level of benefits" to include cost of coverage or to expressly prohibit an increase in the cost of coverage charged to the plaintiffs, the parties incorporated all of the summary plan description's terms and conditions, including its cost of coverage provision, into

---

**5.** *Thorne* is likewise distinguishable. In that case there was no suggestion that the nonparty against whom plaintiffs sought to enforce the settlement had agreed to be bound by the settlement's terms. *See* 30 F.3d at 370 ("The district court was therefore without authority to extend the agreement to DHS, a party that did not bargain for it or agree to it. . . .").

**308**

the Stipulation of Settlement. Construing the Stipulation of Settlement in this manner, the court finds that Uniroyal and its successors, like UGTC, cannot terminate or materially reduce the retirees' "level of benefits" as described in the summary plan description to the Comprehensive Medical Plan, but they may increase the cost of coverage for such benefits "in accordance with plan experience and medical cost escalation."

The language of the parties' agreement leaves room for no other interpretation.

Notwithstanding our agreement with the district court regarding the authority of the Consent Judgment over UGTC and UGTC's authority to increase the rates it charges retirees (subject to the parameters of the Consent Judgment), we disagree with the district court's conclusion that rate increases must be justified only by plan experience in providing benefits to this class as a subset of all the plan participants.

We can find no indication in the Settlement Agreement that the parties intended the price of benefits to any subset of retirees to be justified by the cost of providing benefits to that subset. Indeed, the Comprehensive Medical Plan description, which was incorporated by the Settlement Agreement, states that the plan covers "active or retired" employees, a group much larger than the plaintiff class. Furthermore, allowing price increases based on cost increases relating to a small subset of plan participants (those earliest retired and on average oldest) would deprive the plaintiff class of one chief benefit of the consent decree: insurance under the overall plan, with the attendant risk spreading that inhere in such benefit plans.

Accordingly, we hold that UGTC may increase the price it charges its retirees for receiving benefits under the plan only in so far as that increase is justified by "plan experience and medical cost escalation" (not limited to plaintiffs' plan experience), and as otherwise dictated by the Settlement Agreement.

**6.** This assumption is technically incorrect. A party need not succeed on the merits in order for its counsel to receive fees under § 1132(g)(1).

We express no view as to whether UGTC's proffered plan experience cost data justifies the increase UGTC seeks to impose on the Tire retirees. Ultimately, there may be no dispute on that question that the parties need to litigate. In any event, any such issue would be for the district court on remand.

### C. Attorney's Fees

#### 1. Standard of Review

The question regarding the correctness of the district court's refusal to award attorney's fees to plaintiffs' counsel hinges on the interpretation of the Settlement Agreement. As indicated above, we review such decisions *de novo*.

#### 2. Review

Paragraph twenty-three of the Settlement Agreement authorized the shifting of attorney's fees in enforcement proceedings pursuant to 29 U.S.C. § 1132(g)(1). That statute, which is part of ERISA, says "[i]n any action under this subchapter [of ERISA] ... the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." *Id.*

The district court's reasoning started with the assumption that § 1132(g)(1) requires a party to obtain relief under ERISA in order for fees to be shifted.[6] The district court then considered whether this action to enforce the Consent Judgment arose under ERISA. The district court first observed that the litigation to enforce the Consent Judgment revolved around whether the Consent Judgment could be enforced against a nonparty and whether that Consent Judgment allowed a price increase. Because these questions implicated the law of judgments and the law of contract interpretation, and did not require the application of ERISA, the district court reasoned that the litigation did not arise under ERISA. Therefore, the district court reasoned that the Consent Judgment did not authorize an award of attorney's fees to plaintiffs' counsel in this case.

*See Miller v. United Welfare Fund,* 72 F.3d 1066, 1074 (2d Cir.1995).

We think the judge erred in interpreting the Consent Judgment as not authorizing an award of attorney's fees. The Settlement Agreement does not purport to reflect the parties' interpretation of ERISA. Accordingly, an action seeking to enforce the Agreement would rarely, if ever, hinge on an interpretation of ERISA. Any such action, such as this case, instead will depend on an interpretation of the Agreement itself. Thus the district court's interpretation of the Settlement Agreement's invocation of 29 U.S.C. § 1132(g)(1) (as requiring relief under ERISA as a prerequisite to an award of attorney's fees) effectively reads the fee-shifting provision out of the Agreement. Such a construction violates the fundamental precept of contract interpretation that all terms of an agreement should be given effect if possible. *Mastrobuono v. Shearson Lehman Hutton, Inc.*, — U.S. —, —, 115 S.Ct. 1212, 1219, 131 L.Ed.2d 76 (1995).

Instead, the Settlement Agreement's reference to 29 U.S.C. § 1132(g)(1) reflects that in deciding whether to award attorney's fees in an action to enforce the Settlement Agreement, the parties intended the district court to consider the five factors that must go into a fee award under that statute. When the Settlement Agreement was executed, the case law was clear (and continues to be clear today) that before a district court awards fees under § 1132(g)(1), the court should consider:

> (1) the degree of the offending party's culpability or bad faith, (2) the ability of the offending party to satisfy an award of attorney's fees, (3) whether an award of fees would deter other persons from acting similarly under like circumstances, (4) the relative merits of the parties' positions, and (5) whether the action sought to confer a common benefit on a group of [retirement] plan participants.

*Miles v. New York State Teamsters Conference Pension and Retirement Fund Employee Pension Benefit Plan*, 698 F.2d 593, 602 n. 9 (2d Cir.), *cert. denied*, 464 U.S. 829, 104 S.Ct. 105, 78 L.Ed.2d 108 (1983); *see also Miller v. United Welfare Fund*, 72 F.3d 1066, 1074 (2d Cir.1995) (applying the same five-factor test).

Because the district court concluded that the Settlement Agreement precluded consid-

eration of an award of fees in this case, the court did not engage in the above-described factor analysis. This was error, and we remand for consideration by the district court in the first instance. *See International Bhd. of Teamsters, Joint Council 18 v. New York State Teamsters Council Health and Hosp. Fund*, 903 F.2d 919, 924 (2d Cir.), *cert. denied*, 498 U.S. 898, 111 S.Ct. 251, 112 L.Ed.2d 210 (1990).

### III. CONCLUSION

As explained above, we hold that UGTC is bound by the terms of the Consent Judgment. We hold that pursuant to that Judgment, UGTC may increase the rates it charges retirees if such increases are justified by plan experience and cost escalation. We also hold that the Consent Judgment authorizes the district court in its discretion to award attorney's fees to plaintiffs' counsel in compensation for their efforts to enforce the Consent Judgment. We leave to the district court any questions the parties may have regarding whether UGTC's data relating to plan experience and cost escalation justifies the rate increase UGTC seeks to impose on the Tire retirees. The district court should also be the first to decide the question of the propriety of awarding, and the reasonableness of, the fees which plaintiffs' lawyers seek.