**UNITED STATES of America,**

v.

**Angelo PACCIONE, et al., Defendants.**

**No. 89 Cr. 446(CBM).**

United States District Court,
S.D. New York.

Sept. 3, 1997.

---

---

*OPINION*

MOTLEY, District Judge.

On July 17, 1997, this court held a contempt proceeding to determine whether or not Dominick Vulpis, the brother of defendant Anthony Vulpis, should be held in contempt of the court's June 17 and June 25 Orders directing him to take certain actions with respect to assets allegedly belonging to the Rosedale Carting Co. ("Rosedale"). The court finds Vulpis to be in contempt and orders him to pay the attorney's fees and costs of the Receiver of Rosedale as well as compensatory sanctions in an amount to be determined at the close of discovery.

## BACKGROUND

The underlying facts in this case have been set forth in this court's previous opinion sentencing three of defendants and familiarity therewith is assumed. *See U.S. v. Paccione,* 751 F.Supp. 368 (S.D.N.Y.), *aff'd,* 949 F.2d 1183 (2d Cir.1991). To summarize briefly, this case began as a criminal action against Angelo Paccione, Anthony Vulpis, and a number of other defendants. On June 8, 1990, a jury found defendants guilty under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) and (d) (West 1988), and related fraud charges. The court approved a Forfeiture Consent Order on that date requiring defendants to pay $22 million to the United States within 90 days.

Barrington D. Parker[1] was then appointed, by Order dated June 19, 1990, Trustee and Receiver (the "Receiver") for the government's interest in those corporations which were owned by defendants, including Rosedale, a waste carting company and one of the corporate defendants. Nearly nine years later, the government has yet to receive the bulk of the $22 million which it was supposed to collect.

Rosedale was one of the largest assets owned by defendants. However, the Receiver encountered numerous obstacles in his attempt to sell it. One major problem has been a complete lack of interest among the purchasing public. (Petition filed by Louis D'Angelo on June 16, 1997 in support of his motion for a temporary restraining order, ¶ 8). In addition, Rosedale's competitors unlawfully began to acquire a good deal of its business as early as 1991. (D'Angelo Pet. ¶ 9)[2]. Though the Receiver brought actions against a number of the competing carting companies for these predatory activities, he was able to obtain only $825,000 in settlement, a small fraction of the value of business lost by Rosedale. (D'Angelo Pet. ¶ 10). Finally giving up hope of ever obtaining a fair price for Rosedale for these reasons, the receiver sold the company on December 27, 1994 for the relatively modest sum of $6.2 million to KC Waste Services, Inc., a company in which Dominick Vulpis held a significant minority interest (D'Angelo Pet. ¶ 13).

On February 13, 1997, Dominick Vulpis pled guilty in New York Supreme Court to two counts of the crime of Combination in Restraint of Trade and Competition and admitted that he had participated with other members of the waste carting industry in a customer allocation scheme whereby business formerly belonging to Rosedale was diverted to a competitor and then funneled back to him. (Tr. at 22.) In particular, Vulpis admitted that a rival waste carter was providing services to the Ferdinand Gutman Company, which had once been serviced by Rosedale, and that this carter compensated him by paying him $320,000. (Tr. at 24.) This payment was disguised as a fee for consulting services and was paid to Lyn–Val, Inc., a corporation controlled by Vulpis. Another rival carting company, Rockaway Recycling, also admitted to engaging in similar activity with defendant Vulpis when it pled guilty to related charges on Jan. 13, 1997. (Jan. 13 Tr. at 3–4.)

Suspecting that Vulpis may have engaged in other payment schemes which led to the loss in value of Rosedale prior to its sale to KC Waste, the Receiver gained access to documents seized by the District Attorney in connection with its indictment of Vulpis. After reviewing the documents on June 10, 1997, the Receiver concluded that Vulpis may have collected in excess of $4 million from rival carting companies for business which they had taken from Rosedale. Moreover, one document suggested to the Receiver that Vulpis had obtained approximately $6.3 million in connection with the sale of Rosedale to KC Waste, implying that, absent this payment, KC Waste would have been able to pay a great deal more for Rosedale. (D'Angelo Pet. at ¶ 24.) The Receiver also determined after inspecting the seized documents that a state court breach of contract action brought by Vulpis against KC Waste and related companies (collectively, the "Vulpis Action Defendants") was an attempt by Vulpis to collect some of the payments which were owed to him under these schemes and that such payments were properly assets of the Receiver, since they led to the loss of Rosedale's value.

On the basis of this as well as other information provided by the Receiver to the court, the court issued a temporary restraining order, dated June 17, 1997 (the "June 17 Order"), directing Vulpis to (1) place certain funds which he had received into an escrow account under the supervision of the Clerk of the Court, (2) instruct certain persons who had made payments to Vulpis or his nomi-

---

1. By Order dated May 20, 1992, Louis D'Angelo succeeded Parker as Receiver to Rosedale. D'Angelo remains Receiver to this day.

2. This court later determined that Michael Vulpis, the father of Dominick and Anthony Vulpis, played a role in orchestrating these predatory actions. As a result, Michael Vulpis was found in contempt of this court for interfering with the assets of the Receivership and was sentenced to six months in jail.

nees that any future payments were to be paid directly into the escrow account, (3) deliver to the trustee and Receiver appointed by the court in this matter copies of such instructions within two days of the June 17 Order, and (4) appear in court for a hearing on June 23, 1997 to show cause why a preliminary injunction should not be granted. In addition, pursuant to the All–Writs Act, 28 U.S.C. § 1651, the court removed the state court action brought by Vulpis to this court. The June 17 Order was granted *ex parte* because the court was concerned that notice to Vulpis would induce him to settle the state court action prematurely.

Vulpis did appear on June 23, 1997, along with an attorney, Mr. Charles Singer, who claimed that he represented Vulpis in the removed state court action but could not represent him in connection with the matters raised in the June 17 Order because he felt that it raised Fifth Amendment issues which he was not competent to handle. Thus, he requested that Vulpis be given more time to retain counsel to represent him. The court adjourned the hearing until July 10, 1997. Moreover, on June 25, 1997 the court issued a revised order (the "June 25 Order") which clarified some of Vulpis' obligations and set a briefing schedule for the July 10 hearing.

On July 10, 1997, Mr Singer again appeared and represented to the court that Vulpis had still not retained an attorney. Though Mr. Singer repeated that he did not represent Mr. Vulpis in connection with matters raised in the June 17 and June 25 Orders, he continued to address the court on Vulpis' behalf. Because Vulpis (1) had not submitted papers in accordance with the June 25 Order, (2) had not sent copies of notifications as required by the both the June 17 and June 25 Orders, and (3) had not deposited in an escrow account the full amount of consulting fees paid to him, this court directed the Receiver to prepare an Order to Show Cause why Vulpis should not be held in contempt of court and set the matter for a hearing on July 17, 1997.

At the July 17 hearing, Vulpis appeared with counsel whom he had recently retained. Counsel's request for a further adjournment was denied, and Vulpis was directed to testify about his compliance with the June 17 and June 25 Orders.

However, Vulpis refused to answer on Fifth Amendment grounds a series of questions concerning his present financial condition, his relationship with Lyn–Val Associates and his receipt of payments from various carting companies.

At the close of the hearing, the court originally proposed to hold the preliminary injunction hearing on September 15, 1997, but Vulpis' counsel requested that the date be made September 30 because he had long standing vacation plans and was intending to be out of the country on September 15. The court then scheduled the hearing for September 30th and set a briefing schedule for the parties.

**DISCUSSION**

**I. Standard for Contempt**

In order for a district court to hold an individual liable for civil contempt, three conditions must be met: (1) the district court must have entered an order that was clear and unambiguous, (2) it must be shown by clear and convincing evidence that the alleged contemnor failed to comply with the order, and (3) the alleged contemnor must have failed to introduce credible evidence of a present inability to comply. *Huber v. Marine Midland Bank*, 51 F.3d 5, 10 (2d Cir. 1995). Each of these will be examined in turn.

**A. Clear and Unambiguous Order**

The court's June 17 and June 25 Orders were clear and unambiguous in all material respects. Specifically, both Orders directed Vulpis (1) to place any funds he received from the Vulpis Action Defendants into an escrow account (June 17 Order, p. 3–4; June 25 Order, p. 4), (2) to place in an escrow account all funds he had received from persons in the waste removal industry (June 17 Order, p. 4; June 25 Order, p. 4–5), (3) to instruct such persons to make all future payments directly into an escrow account, and (4) to deliver to the Receiver copies of the instructions which were sent to such persons.

■ While not precisely claiming the first provision to be ambiguous, Vulpis does indicate that he does not believe that it could possibly apply to money which he had received from the Vulpis Action Defendants before the issuance of the June 17 and June 25 Orders and which he had already forfeited to the District Attorney in connection with his guilty plea in the state criminal action. The court fails to comprehend how Vulpis could have possibly misinterpreted an Order directing him to place "*any* funds which he received from the Vulpis Action Defendants...." (June 17 Order, p. 3) (emphasis supplied). Clearly, the Order does not exempt money which Vulpis has already spent in dealing with other matters.[3]

■ Vulpis, through his various attorneys, also claims that both Orders are ambiguous as to the notification provision described *supra*. Mr. Singer, who, as was mentioned earlier, supposedly did not represent Vulpis in connection with these matters, did write to the Receiver's counsel (a copy of which was provided to this court) on June 20, 1997, indicating that there was some "ambiguity" in the June 17 Order because it did not make clear whether Vulpis was supposed to notify all persons in the waste carting industry from whom he had ever received payment to make any future payments into an escrow account, or whether he needed to notify only those persons from whom he expected future payment. (Letter from Charles A. Singer to Arthur S. Katz, June 19, 1997, p. 1–2). Vulpis' counsel reiterates the same argument with regard to the June 25 Order in his Memorandum of Law On Behalf of Dominick Vulpis, filed after the contempt hearing. (Vulpis Mem. at 15, n. 10).

The court finds, however, that neither Order is ambiguous as to the requirement of notification. The June 17 Order directs Vulpis to "place any funds he or his nominees or assigns have received as purported consulting fees ... from persons in the waste carting ... industry .... into an escrow account

... and to instruct such persons to make all future such payments into such escrow account." June 17 Order, p. 4. It seems rather clear that this requires Vulpis to instruct all persons who have ever given Vulpis consulting fees to make any future payments into the escrow account, regardless of whether such payments are expected in the future. In the June 25 Order, the language is even more clear, with the words "to instruct such persons" modified to read "to instruct all such persons."

Vulpis nonetheless insists that the court could not have meant what it said since it would make little sense to direct him to notify persons from whom no future payments were expected to make future payments into an escrow account. Aside from the fact that Vulpis should have adhered, in the absence of further instruction from the court, to the words of the Order rather than attempt to divine a contrary intention, there is a perfectly logical explanation for why Vulpis would be required to inform all persons from whom he had ever received payment rather than focus exclusively on those individuals from whom he expected future payment. Neither the court nor the Receiver knew the identities of these individuals and could therefore not examine the veracity of Vulpis' claims that they would not give him any payments in the future. Thus, the court found it more prudent to require notification of all parties who had made a past payment rather than attempt the well-nigh impossible task of determining which persons were expected to make future payments and limiting notification to those persons.

**B. Vulpis' Compliance with the Orders**

■ The record in this case also shows that Vulpis failed to comply with all four provisions listed in Sec.I.A *supra*. Each of these provides an independent finding of civil contempt.

---

**3.** Of course, since civil contempt is intended to be coercive and not punitive, Vulpis could argue that the fact that he disgorged $250,000 prior to issuance of the June 17 Order rendered him unable to comply therewith. *See* Sec.I.C *infra*. Vulpis, however, does not argue that he is unable to comply with the Orders; he argues, despite the clarity of the language contained in them, that they do not include a requirement to escrow any money which Vulpis spent prior to issuance. This is simply not the case.

### 1. Deposit of Funds Received from the Vulpis Action Defendants

This is the provision which is most easily addressed, since Vulpis himself admitted that he did not escrow all funds received from the Vulpis Action Defendants. Though Vulpis did escrow approximately $305,000, he admitted at the contempt hearing that he did not include with that amount approximately $108,000 he had received from one of the Vulpis Action Defendants in March of 1995 (Tr. at 43), nor did he include over $250,000 which he had disgorged to the District Attorney as well as money he had spent prior to the issuance of the June 17 Order on living expenses, attorney's fees, and taxes. (Tr. at 35–36). As was indicated in Sec. I.A *supra*, the Order clearly required all of this money, which could well be the property of the Receiver, to be placed in escrow with no exceptions provided.

### 2. Deposit of Funds Received from Other Persons in the Waste Carting Industry

Vulpis indicated at the contempt hearing that all funds which he had escrowed had come from the Vulpis Action Defendants and that therefore none of the money included any payments from other persons in the waste carting industry. (Tr. at 43). Given this admission, the court finds that Vulpis has failed to comply with those parts of the June 17 and June 25 Orders directing him to place in escrow funds received from other persons in the waste carting industry.

Given Vulpis' admission in the state court criminal matter that he had received payments from at least one member of the waste carting industry in connection with the customer· allocation scheme, given that Rockaway Recycling had also admitted to conspiring with Vulpis to demand payments from another member of the industry in connection with the scheme, and given the documentary evidence provided to the court prior to issuance of the injunction and described *supra*, it is perfectly clear that Vulpis has received payments from other members of the waste carting industry which he did not place into escrow.

### 3. Instructing Members of the Industry to Place Future Payments Into an Escrow Account and Providing the Receiver with a Copy of Such Instructions

Vulpis has clearly failed to comply with these provisions as well. Vulpis indicated at the contempt hearing that, to the best of his knowledge, he had sent notices only to the Vulpis Action Defendants. (Tr. at 60). This is clearly inadequate, since, for the reasons stated in Sec.I.B.2 *supra*, there is a good deal of evidence to suggest that there are other members of the waste carting industry who have given Vulpis payments in·the past. The Receiver has indicated in his papers that from the time of the contempt hearing, Vulpis has sent Joan Vulpis, Lyn–Val, and Rockaway Recycling copies of the court's Orders and has claimed that such individuals have therefore been "notified." (Receiver's Mem. at 12, n. 6). However, aside from the clearly deficient manner in which this "notification" was undertaken (it was done weeks late and the parties were never actually instructed to send future payments to an escrow account-they were only sent copies of the Orders directing Vulpis to tell them to do so), there remain others to whom Vulpis should have sent notice but has not.

### C. Inability to Comply

In the words of the Second Circuit, "a civil contempt Order is designed to be coercive rather than punitive. Accordingly, a party's complete inability, due to poverty or insolvency, to comply with an Order to pay court-imposed monetary sanctions is a defense to a charge of civil contempt." *Huber*, 51 F.3d at 10. Thus, for example, the court could not hold Vulpis in contempt for failing to turn over money which the Orders required him to turn over if, prior to the issuance of the June 17 Order, he had already spent the money and had no other assets from which he could draw in order to satisfy the court's Order.

However, the Supreme Court has made clear on numerous occasions that the alleged contemnor bears the burden of producing evidence that he was unable to comply with the court's Orders. *U.S. v. Rylan-*

*der,* 460 U.S. 752, 757, 103 S.Ct. 1548, 1552, 75 L.Ed.2d 521 (1983); *McPhaul v. United States,* 364 U.S. 372, 379, 81 S.Ct. 138, 142–43, 5 L.Ed.2d 136 (1960); *Maggio v. Zeitz,* 333 U.S. 56, 75–76, 68 S.Ct. 401, 411, 92 L.Ed. 476 (1948). *See also Huber,* 51 F.3d at 10. Moreover, if a defendant refuses to produce such evidence on Fifth Amendment grounds, then he may be found in contempt. *Rylander,* 460 U.S. at 758–59, 103 S.Ct. at 1553. Thus, "while the assertion of the Fifth Amendment privilege against compulsory self-incrimination may be a valid ground upon which a witness ... declines to answer questions, it has never been thought to be in itself a substitute for evidence that would assist in meeting a burden of production." *Id.* at 758, 103 S.Ct. at 1553; *see also Huber,* 51 F.3d at 10 (quoting *Rylander*).

■ Using these principles, the court readily determines that Vulpis has failed to sustain his burden regarding inability to comply. He refused to answer questions regarding his own net worth from which the court would have been able to ascertain whether or not he was capable of compliance with the Orders, and he has provided no further information from which the court could conclude that his failure to comply with the Orders was due to inability rather than wilful intransigence.

## II. Vulpis' Defense

■ The papers which Vulpis submitted after the contempt hearings barely address any of the issues raised *supra.* Instead, Vulpis focusses the bulk of his attention upon a legal issue so absurd that it borders on the frivolous: he seeks to argue that he cannot comply with the Orders because to do so would require him to incriminate himself. Thus, rather than address the issue of contempt, Vulpis attempts to contest the validity of the June 17 and June 25 Orders.

■ It is well-settled law that a party cannot at a contempt proceeding contest the order with which he has failed to comply. In the words of the Supreme Court:

It would be a disservice to the law if we were to depart from the long-standing rule that a contempt proceeding does not open

to reconsideration that legal or factual basis of the order alleged to have been disobeyed and thus become a retrial of the original controversy. The procedure to enforce a court's order commanding or forbidding an act should not be so inconclusive as to foster experimentation with disobedience.

*Maggio,* 333 U.S. at 69, 68 S.Ct. at 408. *See also Rylander,* 460 U.S. at 756–57, 103 S.Ct. at 1552 (quoting *Maggio*); *Walker v. City of Birmingham,* 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967); *Huber,* 51 F.3d at 8.

Of course, *Maggio* involved contempt of an order which was issued after an adversary proceeding in which the alleged contemnor had an opportunity to be heard, whereas the present matter involves an order that was issued *ex parte.* Nonetheless, the Supreme Court has made clear in *Walker* that the proper way to challenge *ex parte* orders would be to request a prompt preliminary injunction hearing, not brazenly defy the order. *Walker,* 388 U.S. at 318–19, 87 S.Ct. at 1831. Rather than moving promptly for a hearing, however, Vulpis, through his attorneys, has asked for, and been granted, numerous extensions of time such that a hearing originally scheduled for June 23, 1997 is now expected to begin on September 30, 1997. Having requested more time to prepare before challenging the Orders, Vulpis is foreclosed from challenging them at this proceeding.

## III. Appropriate Sanction

■ The purpose of civil contempt sanctions is to serve either or both of two purposes: (1) to coerce the contemnor into future compliance with the court's order, and (2) to compensate the complainant for losses resulting from the contemnor's past non-compliance. *United States of America v. United Mine Workers,* 330 U.S. 258, 303–04, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947); *King v. Allied Vision, Ltd.,* 65 F.3d 1051, 1062 (2d Cir. 1995); *N.Y. State Nat. Org. for Women v. Terry,* 886 F.2d 1339, 1352–53 (2d Cir.1989).

■ Compensatory sanctions should reimburse an injured party for its actual damages and may not be imposed absent some proof of actual loss. *United Mine Workers,*

330 U.S. at 304, 67 S.Ct. at 701; *Terry*, 886 F.2d at 1353. Moreover, "the [compensatory] sanction should correspond at least to some degree with the amount of damages." *King*, 65 F.3d at 1062.

In imposing coercive sanctions, a court should consider (1) the character and magnitude of the harm threatened by the continued contumacy, (2) the probable effectiveness of the sanction in bringing about compliance, and (3) the contemnor's financial resources and the consequent seriousness of the sanction's burden. *Terry*, 886 F.2d at 1353; *Dole Fresh Fruit Co. v. United Banana Co.*, 821 F.2d 106, 110 (2d Cir.1987). *See also United Mine Workers*, 330 U.S. at 304, 67 S.Ct. at 701. "The ultimate consideration is whether the coercive sanction ... is reasonable in relation to the facts. That determination is left to the sound discretion of the district court." *Terry*, 886 F.2d at 1353. Nonetheless, the Supreme Court has made clear that "in selecting contempt sanctions, a court is obliged to use the least possible power adequate to the end proposed." *Spallone v. United States*, 493 U.S. 265, 276, 110 S.Ct. 625, 632, 107 L.Ed.2d 644 (1990). Finally, a district court can award an injured party attorney's fees if it finds that the contemnor's violation of the underlying order was willful. *King*, 65 F.3d at 1063; *Manhattan Industries v. Sweater Bee by Banff, Ltd.*, 885 F.2d 1, 8 (2d Cir.1989).

The issue of which sanctions to impose in this case is particularly problematic. A compensatory fine at this point is simply impossible because the Receiver could not show proof of actual damages until after discovery has been completed. Noncompensatory fines may defeat the entire purpose of the June 17 and June 25 Orders because they would require Vulpis to pay to the court a fine which he may well pay out of assets he has taken from the Receivership. The Receiver suggests incarceration as a possible sanction, but the court declines to impose it. It is true that incarceration may be applied to a civil contemnor so long as he would be released if he purges the contempt and complies with the underlying order. *International Union, United Mine Workers v. Bagwell*, 512 U.S. 821, 828, 114 S.Ct. 2552, 2559, 129 L.Ed.2d 642 (1994) (distinguishing between incarceration for civil contempt and punitive, and therefore criminal, incarceration on the grounds that, insofar as civil contempt is concerned, the alleged contemnor may be released upon compliance with the underlying order and thus "carries the keys of his prison in his own pocket"); *Shillitani v. United States*, 384 U.S. 364, 370 n. 6, 86 S.Ct. 1531, 1536 n. 6, 16 L.Ed.2d 622 (1966)(noting that a district court may impose a two year prison term for civil contempt which includes an option for earlier release if the contemnor complies with the order); *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797 (1911) (holding that a fixed, twelve month sentence imposed on contemnor was a criminal sanction). However, as indicated above, the court holds that imprisonment is not an appropriate sanction at this time for two reasons.

First of all, since imprisonment is obviously among the most severe sanctions that can be applied for civil contempt, it is questionable whether it is the minimum means necessary to force compliance in this case, which involves the refusal of a single individual to comply with two orders of the court over a two and a half month period. While Vulpis' conduct is egregious, it may not be so egregious as to justify incarceration.

Much more importantly, however, is the fact that the June 17 and June 25 Orders are, by necessity, broad in their scope and require a number of affirmative acts with respect to a number of different persons, some of whom are not known by either the court or the Receiver. In addition, the Orders do not involve conduct in court and are not directly related to the adjudicatory process. Compliance would not be a simple matter to determine insofar as Vulpis is concerned, and "disinterested factfinding and even-handed adjudication [are] essential." *Bagwell*, 512 U.S. at 837–38, 114 S.Ct. at 2563. In such cases, both the Supreme Court and the Second Circuit have held that the "coercive" sanction instituted for civil contempt would in fact be punitive in nature, and Vulpis would be entitled to a criminal trial before such a penalty could be imposed. *Id.* (holding that

noncompensatory $52 million fine levied against union for violating, over a two and a half year period, various provisions of a complex injunction amounted to a criminal penalty which could not be imposed for civil contempt); *N.Y. State Nat. Org. for Women v. Terry*, 41 F.3d 794 (2d Cir.1994)("*Terry II*")(holding that noncompensatory fines of $500,000 imposed against persons blocking abortion clinics could not be imposed absent criminal proceeding).

Thus, rather than impose a noncompensatory penalty which could well be punitive, the court orders that Vulpis pay a compensatory fine to the Receiver in an amount to be determined at the close of discovery, remunerating him for any damages which he has suffered as a result of Vulpis' failure to comply.[4]

 In addition, the court will require Vulpis to pay all of the Receiver's reasonable costs and expenses, including attorney's fees, incurred in connection with this contempt proceeding. There can be little doubt that Vulpis' failure to comply with the June 17 and June 25 Orders was willful. He consulted with three different lawyers regarding compliance with the Orders (Tr. at 21–22), and yet failed to comply with at least four of their provisions. He claimed that there were ambiguities where there were none and he repeatedly asked for extensions of time to prepare for the preliminary injunction hearing. Yet, despite his seeming reluctance to argue the propriety of the June 17 and June 25 Orders at a preliminary injunction hearing, he has refused to comply with the Orders on Fifth Amendment grounds. Vulpis' claim that he believes himself to be in compliance with the Orders defies belief. The Receiver is directed to submit contemporaneous billing records so as to enable the court to determine the amount of attorney's fees to award in this matter.

## CONCLUSION

The court holds Vulpis in contempt of court for willfully violating this court's Orders dated June 17 and June 25, 1997. As a

sanction for this conduct, the court directs Vulpis to pay a fine to the Receiver equaling the amount of damages (to be determined at the close of discovery) which the Receiver has suffered. Vulpis is also directed to reimburse the reasonable costs and expenses of the Receiver, including attorney's fees, incurred in connection with the contempt proceedings. The Receiver is directed to submit contemporaneous billing records so that the court can determine the appropriate amount of fees to award.

4. It should be noted that the contraints created by Bagwell do not apply to compensatory fines.

*Bagwell,* 512 U.S. at 838, 114 S.Ct. at 2563.