**UNITED STATES of America,**

v.

**Angelo PACCIONE, et al., Defendants.**

**No. 89 Cr. 446(CBM).**

United States District Court,
S.D. New York.

Jan. 21, 1998.

Richard A. Martin, Werbel McMillin & Carnelutti, New York City, Charles A. Stillman, Peter E. Dolotta, Stillman & Friedman P.C., New York City, for Defendants.

## OPINION ACCOMPANYING PRELIMINARY INJUNCTION ORDER

MOTLEY, District Judge.

On June 18 and June 25, 1997, the court issued temporary restraining orders directing Dominick Vulpis ("Vulpis") to take certain actions with respect to assets allegedly belonging to the Rosedale Carting Co. ("Rosedale"). Vulpis refused to comply with certain aspects of these orders and, therefore, was held in contempt following a July 17, 1997 proceeding. The court, in light of the findings of fact and conclusions of law discussed below, now issues this opinion which converts the temporary restraining order into a preliminary injunction.

## BACKGROUND

The underlying facts in this case have been set forth in this court's previous opinions and familiarity therewith is assumed. *See U.S. v. Paccione*, 751 F.Supp. 368 (S.D.N.Y.) (sentencing three of the defendants), *aff'd*, 949 F.2d 1183 (2d Cir.1991); *U.S. v. Paccione*, 975 F.Supp. 537 (S.D.N.Y.1997) (summarizing the Receiver's attempts between 1991 and 1997 to procure the long-standing money owed to the federal government). This case began as a criminal action against Angelo Paccione, Anthony Vulpis, and a number of other defendants. On June 8, 1990, a jury found defendants guilty under the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) and (d) (West 1988), and related fraud charges. The court approved a forfeiture consent order on that date requiring defendants to pay $22 million to the United States within 90 days. Barrington D. Parker [1] was then appointed, by Order dated June 19, 1990, Trustee and Receiver (the "Receiver") for the Government's interest in those corporations which were owned by defendants, including Rosedale, a waste carting company and one of the corporate defendants.

Nearly nine years later, the Government has yet to receive the bulk of the $22 million which it was supposed to collect. The Receiver encountered numerous obstacles in his attempt to sell Rosedale and eventually had to sell it for a relatively modest sum to a company called K.C. Waste Services, Inc. ("K.C.Waste"). The difficulty of finding a buyer and of securing a good price were not the function of mere market forces; Rosedale's competitors had eroded the value of the company with predatory activities. Indeed, on February 13, 1997, Dominick Vulpis, who held a significant minority interest in K.C. Waste, pled guilty in New York Supreme Court to two counts of the crime of Combination in Restraint of Trade and Competition and admitted that he had participated with other members of the waste carting industry in a customer allocation scheme whereby business formerly belonging to Rosedale was diverted to a competitor and then funneled back to him, in disguise as consulting fees. *See* 975 F.Supp. at 540.

Suspecting that Vulpis may have engaged in payment schemes which led to the loss in value of Rosedale prior to its sale to K.C. Waste, the Receiver gained access to documents seized by the District Attorney in connection with its indictment of Vulpis. After reviewing the documents on June 10, 1997, the Receiver concluded that Vulpis may have collected in excess of $4 million from rival carting companies for business which they had taken from Rosedale. Moreover, one document suggested to the Receiver that Vulpis had obtained approximately $6.3 million in connection with the sale of Rosedale to K.C. Waste, implying that, absent this payment, K.C. Waste would have been able to pay a great deal more for Rosedale. *See*

---

1. By Order dated May 20, 1992, Louis D'Angelo succeeded Parker as Receiver to Rosedale. D'Angelo remains Receiver to this day.

*id.* The Receiver also determined after inspecting the seized documents that a state court breach of contract action brought by Vulpis against K.C. Waste and related companies (collectively, the "Vulpis Action Defendants") was an attempt by Vulpis to collect some of the payments which were owed to him under these schemes and that such payments were properly assets of the Receiver, since they led to the loss of Rosedale's value.

On the basis of this as well as other information provided by the Receiver to the court, the court issued a temporary restraining order, dated June 17, 1997 (the "June 17 Order"), directing Vulpis to (1) place certain funds which he had received into an escrow account under the supervision of the Clerk of the Court, (2) instruct certain persons who had made payments to Vulpis or his nominees that any future payments were to be paid directly into the escrow account, (3) deliver to the trustee and Receiver appointed by the court in this matter copies of such instructions within two days of the June 17 Order, and (4) appear in court for a hearing on June 23, 1997 to show cause why a preliminary injunction should not be granted. In addition, pursuant to the All–Writs Act, 28 U.S.C. § 1651, the court removed the state court action brought by Vulpis to this court. The June 17 Order was granted *ex parte* because the court was concerned that notice to Vulpis would induce him to settle the state court action prematurely.

Following Vulpis' non-compliance[2] with the above Order and with a June 25, 1997 revised Order which clarified Vulpis' obligations, Vulpis was held in contempt, by opinion dated September 3, 1997. At his contempt hearing, Vulpis argued that his Fifth Amendment rights would be violated if he answered a series of questions concerning his present financial condition, his relationship with Lyn–Val Associates (a corporation controlled by Vulpis which received a payment disguised as a fee for consulting services), and his receipt of payments from various carting companies.

At the close of the hearing, the court scheduled a preliminary injunction hearing for September 30, 1997 and later allowed the parties to submit briefs in lieu of an oral hearing. This opinion follows.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Each aspect of the temporary restraining order will be addressed in turn.

### I. Uncontested Aspects of the Temporary Restraining Order

The first paragraph of the temporary restraining order, dated June 25, 1997, orders that: "Vulpis and the Vulpis Action Defendants be, and hereby are, temporarily enjoined and restrained from prosecuting the Vulpis Action, from settling the Vulpis Action, or from pursuing the Vulpis Action funds in any state or federal court other then the District Court for the Southern District of New York." *June 25 Order, para. (a).* Vulpis does not challenge the incorporation of this part of the temporary restraining order into the preliminary injunction. *Mem. of Dominick Vulpis in Opp. to Certain Provisions of the Prop. Prelim. Inj.,* 2.

Mr. Vulpis likewise is not contesting the second paragraph of the temporary restraining order which essentially forbids him from receiving, disposing, or diverting receivership assets and it, too, will be incorporated into the preliminary injunction. Specifically, this second paragraph directs Vulpis to "place any funds he, or Vulpis' Nominees, Successors or Assigns have received or do receive, directly or indirectly, from or on behalf of the Vulpis Action Defendants (or any of their respective nominees, successors, or assigns) as payments under or related to the Vulpis Agreements, into an escrow account under the supervision of the Clerk of the Court and to instruct the Vulpis Action Defendants to make all such future payments directly into such escrow account." *June 25 Order, para. (b).*

---

2. Specifically, Vulpis (1) did not submit papers in accordance with the June 25 Order, (2) did not send copies of notifications as required by the both the June 17 and June 25 Orders, and (3) did not deposit in an escrow account the full amount of consulting fees paid to him.

## II. Vulpis' Act of Production Challenge to Paragraphs (c) and (d)

Vulpis has challenged the aspect of the temporary restraining order which states, in relevant part, that: "(c) Vulpis be, and hereby is, directed (i) to place any funds he or Vulpis' Nominees, Successors or Assigns have received, or will receive, directly or indirectly, from persons in or at any time associated with the waste carting and waste removal industry ... as purported consulting or other fees or consideration related in any way to former Rosedale 'stops' and customers, or which otherwise constitute payment for property unlawfully withheld or concealed from the Receiver into an escrow account ... and (ii) not to, and to instruct all such persons not to, cease and not to modify any prior arrangements with respect to the amount or timing of such payments, but instead to instruct all such persons to continue to make all future such payments directly into such escrow account...." *June 25 Order*, para. (c).

■ Vulpis opposes the requirement to deposit into escrow funds he has "unlawfully" received from people in the waste carting industry because of the alleged risk of self-incrimination. Under some circumstances, individuals may refuse to produce documents and information sought by the government on the grounds that the production has a testimonial aspect and is therefore tantamount to self-incrimination. *See Doe v. United States*, 487 U.S. 201, 209, 210–11, n. 8, 108 S.Ct. 2341, 101 L.Ed.2d 184 (1988); *Fisher v. United States*, 425 U.S. 391, 409–10, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976). "The Fifth Amendment shields production of documents if the act of producing them constitutes tacit testimony concerning: (1) the existence of papers demanded, (2) their possession or control by the [witness], or (3) the [witness'] belief that the papers are those described in the subpoena." *United States v. Freidus,*

135 F.R.D. 52, 55 (S.D.N.Y.1991) (quoting *Fisher*). Communications must be incriminating as well as testimonial if they are to be protected under the Fifth Amendment. *See Fisher*, 425 U.S. at 391. The communication is not incriminating if the Government can prove that the information relayed was a "foregone conclusion and the [witness] adds little or nothing to the sum total of the Government's information." *Id.* at 411.

■ Prior to the hearing in which Vulpis was found in contempt, Vulpis argued that his Fifth Amendment privilege would be violated by complying with the TRO because he would be "requir[ed] to admit the existence and his receipt" of funds such as consulting fees unlawfully withheld from the receiver. *Mem. of Law on Behalf of Dominick Vulpis,* 19. He also objected to directing (and showing the receiver that he has directed) that future payments be made to the escrow account because that requirement "seeks the identities of the sources of those funds— entities whose existence *vel non* is unknown to the Receiver or to governmental authorities."[3] *Id.*

This Court has already ruled on those objections in the context of the contempt hearing. *See* 975 F.Supp. at 543–544 (noting that an alleged contemnor bears the burden of producing evidence that he or she was unable to comply with the court's orders and that an assertion of Fifth Amendment privilege is not itself a substitute for evidence that would assist in meeting a burden of production). The Fifth Amendment challenge now has arisen again in the context of the entry of the Government's proposed preliminary injunction. Following his contempt finding, Vulpis has acknowledged that the Government knows of 40 people and entities involved with waste carting and has noted that he complied with the TRO by delivering instructions to these people and entities.[4]

---

3. Vulpis quoted from the Receiver's letter to the court: "The Trustee and Receiver cannot at this time be certain as to all of the parties that might have made payments to Dominick Vulpis in recent years in connection with former customers and stops of Rosedale Carting Corp.... On the other hand, Mr. Vulpis knows what payments he received and from whom as well as the identities

of his nominees to whom such payments have been directed." Ltr. of Arthur D. Katz to the Honorable Constance Baker Motley dated June 26, 1997.

4. Vulpis has already provided considerable assistance to the Receiver in his efforts to ascertain the identities of other carters. The Government

However, he "continues to oppose this requirement on Fifth Amendment grounds to the extent that it may be read to require him to identify further such persons." *Mem. of Dominick Vulpis in Opp. to Certain Provisions of the Proposed Prelim. Inj.*, 2.

██ As the language of *Fisher* makes clear, there is no Fifth Amendment violation if the sought information adds a minor or negligible amount to the Government's intelligence. *See* 425 U.S. at 411 (no Fifth Amendment claim when the "existence and production of the papers are a foregone conclusion and the [witness] adds *little or* nothing to the sum total of the Government's information by conceding that he in fact has the papers") (emphasis added). Since the Government already knows of the vast majority of waste carters, Vulpis has no basis for objecting to providing a few more names or entities.

In short, even if Vulpis has a colorable Fifth Amendment challenge here which he did not in the contempt context, the court finds and concludes that the Government can still compel production because it "can demonstrate with reasonable particularity that it knows of the existence [ ] of [the sought] documents" and the new information sought would add little to the sum total of the Government's information. *In re Grand Jury Subpoena Duces Tecum Dated October 29, 1992,* 1 F.3d 87, 93 (2d Cir.1993). The Government has been able to support its contention that it has knowledge of the type of information sought and its request is not overbroad. In *United States v. Freidus,* 135 F.R.D. at 56, a case which discusses the question of what constitutes knowledge in some detail, an individual's "act of production" challenge failed on the grounds that the government had sufficient information about the sought documents based on a two-hour deposition of her husband. *See also In re Heuwetter,* 584 F.Supp. 119 (S.D.N.Y.1984) (grand jury target's Fifth Amendment challenge to order requiring him to produce records of sixteen named companies with which he had been associated failed because exis-

tence and identity of companies already known to government). The *Freidus* court found it significant that the government had actual knowledge of the documents, rather than imputed or inferential knowledge. *Id.; but see Schroeder v. Indorsky,* 1991 WL 280312 (S.D.N.Y. Dec.23, 1991) (fact of foreign travel supported inference that defendant's passport existed; defendant compelled to produce his passport for a receiver).

Vulpis has had at least as much involvement with the receiver as did the deponents in *Freidus,* and the Government has actual knowledge of the companies that may have made payments to Vulpis.

For his overall position, Vulpis has relied primarily on *Grand Jury Subpoena Duces Tecum Served Upon John Doe,* 466 F.Supp. 325 (S.D.N.Y.1979). In the *Grand Jury* case, the Government sought to require the target to "produce all records of any kind received from certain named individuals in connection with or reflecting moneys paid or lent to or received from those persons." *Id.* at 326. In spite of the similarity of the above directive to the one presently at issue, there are two differences which, in the final analysis, speak to the same point. In *Grand Jury,* the request was overbroad *because* the Government did not have enough knowledge about what it was seeking. "During the argument it became clear [to the judge] that the existence of the documents is not . . . a 'foregone conclusion.'" *Id.* at 327. The directive in the present matter is narrower, as it speaks to payments received with respect to a certain kind of transaction, *and* it goes to the existence of something that, in light of the 40 sets of instructions Vulpis has already sent, is not in dispute. Thus, the court holds now, as it held before, that Vulpis has no valid Fifth Amendment objection to providing the Receiver with the sought information.

### III. Vulpis' Challenge to the New Proposed Paragraph

██ Vulpis' second objection concerns a new paragraph the Receiver has proposed adding to the preliminary injunction order.

was able to compile a list of 43 waste carter companies, a list which comprises the "relevant universe of potential waste carting industry pay-

ers" as "confirmed by Vulpis" in his testimony. *Receiver's Reply Mem. in Support of his Mot. for a Prelim. Inj.,* 9.

This paragraph states that "Vulpis is directed to place a minimum of $2,184,983.00 into the Escrow Account." According to the Receiver, "this sum represents the minimum amount of funds that the Receiver can establish through independent evidence that Vulpis has received ... the evidence ... shows that Vulpis directly or indirectly obtained approximately $1.1 million from the Vulpis Action Defendants and approximately $1.1 million from members of the waste carting industry as purported 'consulting' fees." *Receiver's Mem. in Further Supp. of His Mot. for a Prelim. Inj.*, 3. In response, Vulpis notes that the Receiver has not established the "fundamental requirements" of a preliminary injunction—"irreparable harm and likelihood of success on the merits"—in its papers.

The court finds this argument unpersuasive and holds that the Receiver has in fact made the requisite showings. In Vulpis' May, 1997 action in New York Supreme Court, Vulpis swore to an affidavit indicating that he had been paid $1,090,637 in accordance with five agreements under which he is a party with one or more of the Vulpis Action Defendants. The Receiver can confirm that Vulpis received at least $872,449 of this through documentary evidence. Moreover, the Receiver has discovered canceled checks, invoices of bank deposits, and other evidence to support a finding that Vulpis received $1,094,346 from members of the waste carting industry as purported consulting fees. All of this evidence, of course, exists against the backdrop of the circumstances which necessitated the temporary restraining order: the Receiver's thwarted, longstanding, elusive attempts to secure the money owed to the government. Without securing these crucial payments surrounding the waste carting company transactions, the Receiver will never begin to obtain the money for the government.

Thus, the court will add a new paragraph to the preliminary injunction ordering that Vulpis deposit a sum of $1,627,482 into the escrow account. The court has arrived at this figure as follows:

| | |
|---|---|
| Amount from the Vulpis Action Defendants: | $872,449.00 [5] |
| Plus Amount from the Consulting Fees: | $1,094,346.00 |
| Minus One Deposit Already Paid: | $305,389.11 [6] |
| Minus Another Deposit Already Paid: | $33,923.89 [7] |
| **TOTAL:** | **$1,627.482.00** |

## CONCLUSION

For the reasons stated above, the court will: (1) incorporate those uncontested aspects of the temporary restraining order into the preliminary injunction; (2) deny Vulpis' Fifth Amendment claims; and (3) add a new paragraph directing Vulpis to pay the sum of $1,627,482.00 into the Escrow Account in the clerk's office, a figure which represents the minimum the Government can show must be secured in an escrow account at this time.

---

**5.** The court is issuing this figure rather than the larger figure from the affidavit in the event the affidavit was inaccurate and because the $872,-449 number is one the Receiver can definitively support with documentation.

**6.** Vulpis testified at the contempt hearing that the check for this amount he sent to the Escrow Account was from the Vulpis Action Defendants.

**7.** Vulpis subsequently deposited a check for this amount into the Escrow Account.