Michael O'HEARN and Melinda
Midajah O'Hearn,
Plaintiffs,

v.

BODYONICS, LTD., Great Earth Companies, Inc., and Phoenix Laboratories, Inc., Defendants.

No. CV 98–1168(ADS).

United States District Court,
E.D. New York.

July 23, 1999.

Dewey, Pegno & Kramarsky, LLP, New York City (David S. Pegno, Stephen M. Kramarsky, of counsel), for plaintiffs.

Kendig & Ross, Los Angeles, California, for plaintiffs.

Hoffinger, Friedland, Dobrish, Bernfeld & Stern, P.C., New York City (Philip S. Ross, Scott L. D'Aloise, of counsel), for defendants.

### MEMORANDUM DECISION AND ORDER

SPATT, District Judge.

This motion to punish the defendants for civil contempt for concededly violating Court orders, raises the issue of whether the defendants have been "reasonably diligent and energetic" in attempting to comply with the orders.

The plaintiffs commenced this diversity based breach of contract action on February 17, 1998. The lawsuit is grounded on two written contracts between the defendants, Bodyonics, Inc., Great Earth Companies, Inc. and Phoenix Laboratories, Inc. (collectively, "Bodyonics" or the "defendants"), and the plaintiffs, Michael O'Hearn and Melinda Midajah O'Hearn ("the O'Hearns" or "the plaintiffs"). The O'Hearns are professional body builders and fitness models who the defendants contracted with to endorse and promote the products. The amended complaint sets forth four causes of action, as follows: first, for breach of contract; second, under the New York Civil Rights Law Section 51; third, based on Federal Lanham Act Section 43(a); and fourth, alleging New York common law unfair competition. The defendants' amended answer asserted eight counterclaims against the O'Hearns for breach of contract; breach of the implied covenant of good faith; breach of fiduciary duty; and rescission of the contracts. Four of the defendants' counter-

claims were dismissed on motion in an October 12, 1998 decision of this Court. *See O'Hearn v.. Bodyonics, Ltd.,* 22 F.Supp.2d 7 (E.D.N.Y.1998).

## I. BACKGROUND

Familiarity with all prior opinions is presumed. The O'Hearns, a married couple residing in California, are accomplished body builders and fitness models. Michael O'Hearn, in particular, has earned numerous honors in the bodybuilding industry; most recently the 1997 "Mr. Natural Universe" title. The defendants are Delaware corporations with principal places of business in Hicksville, New York, and are engaged in the business of manufacturing, distributing, marketing and selling vitamins and nutritional supplements throughout the United States.

Bodyonics entered into two separate, virtually identical contracts with each of the O'Hearns. Both agreements provided for a two-year term, beginning on April 1, 1997. By the terms of these contracts, in return for monthly payments plus a percentage of gross sales, the O'Hearns agreed to endorse and promote Bodyonics' products by, among other things, making personal appearances at power lifting shows and other public events. The O'Hearns also agreed to permit Bodyonics to use their names, signatures and photographs in connection with the marketing, promotion, advertisement and sales of its products.

The contracts contained a termination clause, which provided that Bodyonics could unilaterally terminate the contracts for "just cause," which included certain express circumstances.

## II. THE PRIOR PROCEEDINGS

### A. The May 13, 1998 Opinion of this Court

In a May 13, 1998 decision, this Court denied the plaintiffs' motion for a temporary restraining order, brought on by order to show cause, seeking an order restraining the defendants from doing any of the following:

1. Shipping, distributing, delivering or selling, or permitting the same, of any product in any package or trade dress that bears a photograph of Mr. and/or Mrs. O'Hearn;

2. Ordering, placing, requesting, arranging or permitting the appearance of any advertisement that contains a photograph of Mr. and/or Mrs. O'Hearn;

3. Shipping, distributing or delivering, or permitting the same, of any promotional brochure or other printed matter containing a photograph of Mr. and/or Mrs. O'Hearn;

4. Shipping, distributing or delivering, or permitting the same, of any promotional "newsletters," including the publication known as "Virtual Muscle," containing a photograph of Mr. and/or Mrs. O'Hearn;

5. Shipping, distributing or delivering, or permitting any product catalog containing a photograph of Mr. and/or Mrs. O'Hearn.

The plaintiffs' motion for a preliminary injunction was referred to the Honorable Nicholas Tsoucalas of the United States Court of International Trade, who was sitting by designation in the United States District Court for the Eastern District of New York.

### B. The May 27, 1997 Decision of Judge Nicholas Tsoucalas

In a decision dated May 27, 1997, Judge Tsoucalas denied the plaintiffs' request for a preliminary injunction, and ruled that the defendants had a six-month period— through August 6, 1998—to continue use of the plaintiffs' names, likenesses and images in accordance with the six-month "run-off" provision contained in each of the contracts. Judge Tsoucalas further held that after the run-off period, distribution by the defendants of any materials, including advertisements using the names, like-

ness or images of each of the plaintiffs, would be in violation of the agreements.

## C. *The September 18, 1998 Directive by this Court*

On or about September 18, 1998, the plaintiffs filed a second motion for a temporary restraining order and a preliminary injunction based on the alleged continued use of the O'Hearns' images in August 1998, by the defendants, after the conclusion of the run-off period. In particular, the plaintiffs asserted that the defendants: (1) used Michael O'Hearn's picture on vitamin bottles displayed at a promotional booth set up at a bodybuilding competition; and (2) used the plaintiffs' images in a catalog.

On September 18, 1998, the Court directed the parties to appear before United States Magistrate Judge Michael L. Orenstein, who was instructed to conduct a hearing on the plaintiffs' motion and to issue a Report and Recommendation. During this September 18, 1998 appearance, the Court directed the defendants to discontinue distribution of materials and products containing the plaintiffs' image and likeness until there was a hearing on the motion.

THE COURT: I see it. Bodyonics continued use of plaintiffs' likenesses after the six month run-off period ends, August 5th, 1998, would violate the contract?

MR. KRAMARSKY: That's right.

THE COURT: Are you using plaintiffs' likenesses?

MR. ROSS: Your Honor, my client has testified that they are not.

. . .

THE COURT: And the reason I am saying that is there was already a judicial determination, quote, as to Bodyonics continued use of plaintiffs' likenesses at the six month—

MR. ROSS: Your Honor, there is no direction there that we cannot distribute it?

THE COURT: I am directing you not to do it until your adjourned date. We are not starting fresh. We had a determination here already. You will call your client and say I directed not to do it.

. . .

THE COURT: I am signing a TRO. He has a direction to follow.

MR. KRAMARSKY: Thank you, Your Honor.

THE COURT: I am going to send this probably for a hearing. I am sure there are factual issues. And you hear one already, that it was inadvertently sent out.

Is that correct?

MR. ROSS: Yes.

. . .

THE COURT: They should desist from doing that, Mr. Ross. It makes not only legal sense, it makes common sense. And you have an opinion by a judge of this Court that says it would violate the contract to do it. Have them stop doing it, Mr. Ross. Is that clear?

MR. ROSS: Yes, your Honor.

Transcript of the September 18, 1998 Court Conference, pp. 5, 7, 8 and 12 (emphasis supplied).

On that same date, September 18, 1998, the Chief Operating Officer of Bodyonics, Stephen R. Stern, issued and circulated a memorandum, advising key employees of Bodyonics of the Court's directive.

## D. *The November 17, 1998 Consent Preliminary Injunction*

On November 3, 1998, the parties entered into a Consent Preliminary Injunction (the "Injunction"), which this Court "So Ordered" on November 17, 1998. In relevant part, the Injunction provided that the defendants are:

[H]ereby preliminarily enjoined, pending a determination of this action, from publicly exhibiting, distributing, delivering, publicly displaying, or shipping any items, including but not limited to prod-

ucts, packages, catalogs, newsletters, brochures, advertisements and other printed matter of any kind whatsoever, containing the image, likeness or name of either of the Plaintiffs, together or individually.

### III. *THE PRESENT MOTION*

Presently before the Court is the plaintiffs' motion, brought on by Order to Show Cause, to hold the defendants in civil contempt for using Michael O'Hearn's photograph in their advertisement, placed in the February 1999 issue of "Natural Bodybuilding and Fitness Magazine," in contravention of the Consent Preliminary Injunction and this Court's directive of September 18, 1998.

In December 1998, the plaintiffs learned that the February 1999 issue of the magazine "Natural Bodybuilding and Fitness Magazine" contained a full-page advertisement displaying Michael O'Hearns' full-face picture (O'Hearn Aff., Ex. H: the advertisement). The plaintiffs argue that this use of Mr. O'Hearn's photo is particularly harmful because "Natural Bodybuilding and Fitness Magazine" is published quarterly and, therefore will be on the newsstands until February 1, 1999.

The defendants do not deny the fact that Mr. O'Hearn's picture appears in this February 1999 publication (Plaintiffs' Ex. 3) (The ad is annexed and marked appendix). In this regard, the defendants insist that "When advised of the Court's September 18, 1998 directive, [they] believed that the O'Hearns' images and likenesses had, in fact, been eliminated from all advertisements." (Defendants' Memo of Law, at 5; Fischman Aff., ¶ 12). According to the defendants, the offending photograph was "inadvertently" placed with Bodyonics' advertising agency on August 12, 1998, four months before Mr. O'Hearn discovered in December 1998 that his photograph was being used in the February edition of the magazine. "The paperwork was sent by the advertising agency to the magazine on August 18, 1998[,] and, the space closing

date was September 11, 1998." (Defendants Mem. of Law, at 5; Fischman Aff., ¶ 12).

The plaintiffs counter that under the clear terms of this Court's September 18, 1998 directive and the Injunction, the defendants were required to "pull" all outstanding advertisements using the images of the O'Hearns, if possible. (Plaintiffs' Reply Mem., at 2).

### IV. *THE CONTEMPT HEARING— FINDINGS OF FACT*

This opinion and order includes the Court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a). See *Rosen v. Siegel*, 106 F.3d 28, 32 (2d Cir.1997); *Colonial Exchange Ltd. Partnership v. Continental Casualty Co.*, 923 F.2d 257 (2d Cir.1991). During this discussion, the Court will make findings of fact, which will be supplemented by additional findings later in the opinion. This hearing was held only on the issue of liability, except for the testimony of the O'Hearns on the issue of damages, taken as a convenience to them to avoid another trip from California.

#### A. *The Defendants' Case*

Stephen R. Stern is a practicing attorney and is a partner in the attorney of record for the defendants. He is also the Chief Operating Officer of all three defendants and is responsible for the day-to-day operation of the companies. He received a copy of the decision rendered by Judge Tsoucalas that there was to be a six month run-off period expiring on or about August 6, 1998, and that the distribution of any material containing the name, image or likeness of either of the plaintiffs must cease as of that date. Stern testified that after receiving this decision he took certain actions to ensure that it would be implemented.

Q Did you take any actions after you received the decision?

A I believe the decision was received sometime in mid May. From the time the decision was received various acts were indeed taken.

I personally had conversations with Andrew Fischman, Tom Stratman, Mel Rich the President and Chief Executive Officer of Bodyonics, LTD, Kathy Woodward, although not an employee of Bodyonics, LTD, but a person in charge of the warehouses in Delaware and California. . . . Indicating to them on numerous occasions in numerous conversations from May, and I think the period of time you are talking about is August 6th, so from May to August 6th that the labels must change, the trade dress must change, anything containing any name, image or likeness of either of the plaintiffs must change.

We need new labels irrespective of the cost of getting new labels. We need to change our catalogues to the extent they contain any name, likeness of any of the plaintiffs, irrespective of any cost, any brochures, any labels, any packaging, anything where you would find potentially a name, image or likeness of either of the plaintiffs.

So that come August 6th the run-off period being over, there could be no further distribution and we would not be in a position to not have the appropriate type of paraphernalia sent out and I have new product dress to be able to sell on products.

We did indeed spend much money to do that.

Tr. at 14–15.*

Asked to explain how this mistake occurred, Stern testified that Fischman simply forgot that the "powder ad," which is an advertisement of the Pinnacle sports nutrition line, containing a likeness of O'Hearn, had been placed. (Tr. at 63–64.)

Subsequent to August 6, 1998, when he was advised that four boxes and a catalog had gone out with the image or likeness of

the plaintiffs, he investigated and he was "assured that it had been a mishap or . . . a mistake and . . . it did not happen again." (Tr. at 16). Stern reiterated again "in very adamant terms that it can't happen, nothing, nothing, nothing must go out with the images or likenesses of anything of the O'Hearns." (Tr. at 16). He testified that he was assured by everyone that they would comply and, in fact, "thought they had indeed complied with it before." (Tr. at 16).

On September 18, 1998, Attorney Ross advised Stern of the Court's directive that absolutely nothing containing the name, image or likeness of either of the plaintiffs should be distributed by the defendants pending the hearing on the preliminary injunction. Stern then wrote a memorandum to his key people advising them of the Court's mandate. This memorandum is significant in that it indicates an attempt by the defendants to be "reasonably diligent."

TO: Andrew Fischman, Tom Stratman, Kathy Woodward
FROM: Stephen R. Stern
DATE: September 18, 1998
RE: Bodyonics—O'HEARN Litigation

As you are each aware, Bodyonics, Ltd., Great Earth Companies, Inc. and Phoenix Laboratories, Inc. are involved in a controversy with the O'Hearns. The controversy is pending in the Federal Court in Nassau County. Essentially, each of the O'Hearns has alleged that there was a breach of their respective Agreements while there is a counterclaim that they breached their Agreements and fraudulently induced the Companies to enter into the Agreements.

In the course of the controversy, the O'Hearns' sought a preliminary injunction precluding the Companies from continuing to use or distribute any printed materials, advertisements or product with their name or likeness. Their re-

---

* Tr. Refers to the trial transcript.

quest was denied. The Court afforded the Companies the right to continue the distribution through August 6, 1998. But—each of you know this already.

Today, the O'Hearns submitted another request for a preliminary injunction based upon two disparate incidents we will discuss on the telephone. The Court adjourned the request but directed us to tell the Companies to be certain that they do not distribute ANY printed materials or product or any other material with the name or likeness of either of the O'Hearns. This is meant to include displays or anything.

*So please forward a copy of this memo to everyone in each of the Companies advising them to comply with the Court's direction without fail. Please, to the extent possible obtain signatures from persons who could possibly not comply with the direction on a copy of the memo and forward it to me. A violation of the Court's direction could be met with fines or penalties—and will in any event substantially prejudice the Companies rights.*

This direction is to go into effect today without fail. Circulate the memo today.

*This means no consumer is to receive anything with the O'HEARNS name or likeness—indeed, no one is to. Nothing is to be forwarded by anyone.*

If any one has a question please call me or Phil Ross immediately.

Def.Ex. A (emphasis supplied).

After sending this memorandum Stern talked to all three key personnel and advised them to obey the Court Order.

Stern first became aware of the improper use at the end of December 1998. He was advised that a picture of Michael O'Hearn was in the February 1999 issue of Natural Bodybuilding magazine, which had gone on sale in November 1998. Stern testified that "I was quite disturbed and surprised given that as a practicing attorney and being aware of court orders ... as

I take very seriously any court order." (Tr. at 21). He discussed this situation with Andrew Fischman, the Director of Marketing and Advertising. Upon hearing what occurred, Fischman was extremely upset and surprised and did not know how the ad appeared in the magazine.

On redirect examination, discussing the issue of "reasonable diligence," Stern related in detail the steps Bodyonics took to make sure that the O'Hearns' image or likeness was eliminated from their products and advertisements:

Q What did Bodyonics, what steps did Bodyonics take in eliminating the O'HEARNS' image or likeness on their product and/or advertisements?

. . . . .

A When the controversy first arose we attempted to identify all of the areas that the O'HEARNS' image or likeness, including name, might have appeared on. We identified the companies' catalogues and at great cost and expense asked Elan Graphics to reprint, without the image or likeness of Mr. O'HEARN and Mrs. O'HEARN, brand new catalogues. That's one step we took.

The second step we took was to being to [*sic*] develop a new advertising campaign through and with the collaboration of Rabasca & Company new advertisements because the O'HEARNS' picture and likeness, specifically Michael O'HEARN, was in several of the advertisements and to the extent that Michael O'HEARN and Midajah O'HEARN's picture appeared on any of the boxes which were on any of the advertisements we had those redone at great cost and expense again because of the payment and costs and fees to Rabasca and the payments of creating the new labels and the new boxes.

There was a line of products called the Jungle Herbolics which included three products, Synephrinol .... Tribestrol ... and a product called Thermophen ..., that did in fact contain the

image and likeness of I think both of the O'HEARNS.

We had to [sic] having already spent 40,000 to conduct a shoot in California to take their pictures, find a new way to present those labels and that box or that trade dress at again cost and expense, going through drafts and whatnot with the advertising agency with time and effort to come up with another trade dress, another label and another box. We had pamphlets we would hand out at shows which would talk about products in the company that I believe also contained product shots which included the image or likeness of the O'HEARNS, . . . we had to have those redone and we would attend approximately a guesstimate of 20 to 25 shows during the course of a year, maybe even more . . . .

We also had to redo part of our display that appears at a show with our booth that had a picture of at least Mr. O'HEARN. It might have been Mrs. O'HEARN as well, . . . through Gilbert Displays at a cost of at least five to ten minimum thousand dollars . . . .

So I've taken care of the catalogue, the labels, I've talked about the boxes, I've talked abut the brochures. There were also what we call "what is it sheets" and "single page fliers" that would necessarily have pictures of the labels or boxes that had to be changed as well after we had printed tens—more than that, tens of thousands of documents containing their image and likeness.

We talked about the difference of creation, rather the creativity that went into advertising and the general amount of time that the company as a whole would have spent pursuant to my direction telling them "make sure all of these things are changed" and we have nothing, nothing, nothing left to use with the O'HEARN image or likeness. We don't want to be in violation of a Court Order. We don't want to do anything wrong. This is a horrible situation that

we're in. We don't want to make the situation any worse.

. . .

Labels, boxes, ads, catalogues, brochures, pictures in booths, single flier sheets. I have a nagging suspicion I'm leaving something out.

. . .

I think that's a fairly complete answer, though I again have a suspicion that I've left something out.

Tr. at 58–61.

Andrew Fischman has been the Director of Marketing for Bodyonics and Great Earth Companies for two years. He is involved in placing advertisements and coordinating logistics at trade shows and promotional programs, among other duties. In April 1998, Stern told Fischman not to use the image or likeness of the O'Hearns at all as a result of the termination of the contract. In turn, Fischman advised the advertising agency in writing "not to use any of the ads and if necessary to cancel anything or replace creative and request any film that was sent to the magazine to be returned." (Tr. at 80). His memorandum to the advertising agency included the following language:

No ads with any pictures of Mike and/or Midajah O'HEARN are to be run in any magazine. Any ads that are already scheduled to be run with the O'HEARN image must be canceled, or creative replaced.

.    .    .    .    .

Please contact magazines where these ads were run and have them return the films so that we can be sure that the ads do not run (in even in error).

.    .    .    .    .

Call me if you have any questions.

(Def.Ex.D).

In June, Fischman was advised of the run-off deadline to August 6th and the problem that would occur after that date. He described the steps he took to ensure compliance with the Court Order, which

testimony is relevant on the issue of "reasonable diligence."

Q Can you describe the actions you took to eliminate the image or likeness of the O'HEARNS?

A Well, as you can see from the exhibit, in April I advised the advertising agency not to use the advertisements. We had modified certain advertisements that had previously contained the O'HEARNS that we wanted to continue to run, but without any image of them in it. There were other advertisements that we elected to discontinue using.

We redesigned the labels and the boxes for many—for all of the products that contained their image on them and we redesigned new graphics for our trade show booths so that their image would no longer be displayed.

We revised newsletters and segregated—I guaranteed some products so it wouldn't be used. There were some little extra samples that were in my office so they would not be used, so I moved them away.

I reviewed my schedules of advertising to see what ads were scheduled to run to make sure that everything would be in compliance.

Q Did you do anything with regards to the catalogue?

A We redesigned our catalogue, replacing images that had previously had Mike or Midajah, we replaced new packaging with the imaging that had been created so their images would not be created as well.

Q You stated that you modified three advertisements, is that correct?

A Yes.

Tr. at 82–83.

In this regard, the defendants placed in evidence the original, modified and discontinued ads. (See Def.Exs. B and C). The Court notes that there was some confusion caused by the change in the ad campaign.

In addition, Fischman testified with regard to the packaging that "all of the product labels that had contained an image of Mike or Midajah were redesigned and reproduced. Similarly, all of the boxes that those bottles were contained in were redesigned and reproduced without any image of Mike and/or Midajah on them." (Tr. at 86). Samples of the original boxes containing the plaintiffs' images, the new modified boxes without the plaintiffs' images, and the original and modified bottle labels were placed in evidence. (See Def. Exs. E, F, G and H). Also, the original Pinnacle catalogue in which the plaintiffs' images appear (Def.Ex.I) and the revised catalogue omitting the images (Def.Ex.J) were admitted.

Fischman received the curative memorandum from Stern (Def.Ex.A) on September 18, 1998. He had already taken "thorough steps" over the prior months to modify their advertisements, discontinue running the O'Hearn ads, revise and reproduce the packaging and labels, recreate trade show graphics, and redesign and reproduce the catalogues. He and his assistant, Lori Pennisi, signed off on the Stern memo and faxed the signed copy to Stern's office.

In December 1998, Fischman received a phone call advising him that an advertisement containing the photo of Michael O'Hearn had appeared in the issue of National Bodybuilding and Fitness magazine. He stated that he was shocked and surprised at that news. Fischman explained that he "didn't realize at the time the ad contained the image of … O'HEARN." (Tr. at 149). He stated that, at that time, he focused on the powdered products and not on the faces in the ad. Fischman further explained:

Q Now, when you fulled [*sic*] these two documents, or found the documents in December when you received the telephone call from Mr. Stern, what made you become aware of the fact that this advertisement had the O'Hearn image in it?

A When I received the call I was notified of the magazine as well, so I went to look in these records. And when I saw the word powders, it was the first time that it clicked for me that could have had Mike O'Hearn, because we had, again, taken these components form our previous advertising campaign and incorporated them or modified them for the new campaign. And that was the first time that I realized that this inadvertent mistake had taken place, that this had been done, that this ad contained the image of O'Hearn.

Tr. at 153–54.

### B. *The Plaintiffs' Case*

Mel Rich is the President of Phoenix Laboratories and Bodyonics Limited. He was aware of the September 18, 1998 Order of this Court directing the defendants not to use images of the O'Hearns. Rich himself did not take any specific steps to effectuate the Court's Order. He left the details to Stern and Fischman and "instructed Mr. Stern and Mr. Fischman to make sure that nothing was done to show the likeness of Mr. O'Hearn and Mrs. O'Hearn." (Tr. at 74). Rich did not personally participate further in this effort. However, he related in detail what was done by the defendants to eliminate the O'Hearns from their businesses:

Q Mr. Rich, what steps were taken to eliminate the image and likeness of the O'Hearns from either product, trade dress or advertisement?

A A whole strategy was established to—you totally want me to elaborate what we do?

Q Yes.

A We had to establish a new strategy. Mobilize our advertising agency, our graphics department, our creative, pictures, and redesign labels, boxes, peripheral materials, support materials, trade booths and because of the timing of when these things are done and how advertising is done and how you have to do graphics of approving pictures and getting the colors right, we had all kinds of money of overtime and special time to get all of these things done in a short period of time so that we could utilize a whole new strategy away from the image and attitude that we did at the beginning. So the amount of man-hours and dollars that we spent were numerous. So, yes.

Q Do you know when these steps were taken?

A Well, I'm not very good with specific dates and time, but I know that it was done immediately upon hearing that there was some kind of, excuse me for not getting it right, some kind of a lawsuit that we got that said we couldn't do those things anymore. So we mobilized and immediately started to put all of these action plans to work, among which I answered before, Mr. Stern and Mr. Fischman were to head up those efforts.

Q Do you know when those efforts were completed?

A Can you give me the date when that came? Because it was literally weeks. You know, some things were weeks and lead into a couple months until those things were actually approved, but immediately.

Tr. at 76–77.

Melinda Midajah McCullum O'Hearn testified on the issue of damages. She stated that she was injured by the appearance of the ad of Michael O'Hearn in the February 1999 issue of Natural Bodybuilding Magazine. She explained that she was "prevented from getting employment" as a spokes model for another supplement company that is competitive with Bodyonics, even though her picture did not appear in the ad. Melinda explained that she is in "a very small industry and everyone in the industry knows my husband and myself work together a lot . . . so when this photograph is being seen, it automatically reflects on me." (Tr. at 102–03). She currently does not have a contract to endorse any supplement company.

Michael O'Hearn also testified on the issue of damages. He stated that he was injured by his appearance in the magazine ad in that it "stopped" him from getting endorsements. However, Michael conceded that in March 1998, he entered into a sponsorship agreement with a company called Envision Marketing Group ("Envision"), by the terms of which he and his wife were each to be paid $6,000 a month. (See Dft's Ex. L). In rather unclear testimony, Michael stated that the Envision contract was terminated but he has received another unconsummated offer from someone associated with Envision.

Kathryn Woodward is employed by the defendant Great Earth Companies, Inc. in Rancho Cucamonga, California, as Director of Distribution. In that position she is in charge of products going in and out of the warehouses in California and Newark, Delaware. At one point, she learned that there was to be no shipment of products or other materials containing the images of the O'Hearns after August 6, 1998. She was advised of this by a conversation with Stephen Stern. Stern told her that "we couldn't ship anything out of the warehouses after that date." (Tr. at 136). She then verified that the company had all product "on hold." Woodward did this by taking the product out of "good inventory" in the computer and putting it on "hold inventory." In that condition, the product was no longer available for order. Woodward did this prior to August 6, 1998. She also spoke to the West Coast Manager of the Livingston Warehouse, a third-party distribution company and gave him a copy of the September 18, 1998 Stern memorandum. (Dft.Ex.A). Woodward told the Manager "about the importance of the product not going out of the warehouse." She then verified that she had the product on hold "to make sure it wasn't available for shipment." (Tr. at 140). She was not aware of any product by the name or likeness of the O'Hearns going out of the warehouse after September 18th. However, it was possible for shipments to have occurred without her knowledge.

Woodward testified that no one from the defendants made inquiry to her as to how a shipment of material with O'Hearn's image could have occurred. Also, no one asked her to take steps to prevent this error from happening again.

Alan Mizrahi is the President of Elan Graphics ("Elan"). His company prints catalogues, fliers and other promotional material for the defendant Great Earth Companies, Inc. In early 1998, Elan did a first printing of the pinnacle catalogue, which featured products with the O'Hearns on the labels. Elan did a revised catalogue probably in September 1998. The "job ticket," or the description of the work to be done, for the new pinnacle catalogue was dated September 18, 1998 (*See* Plf.Ex. 18). Although he mistakenly testified otherwise at a deposition, Mizrahi stated that "the material would have had to have come in from the client a week or two weeks prior to September 18th" (Tr. at 201), because the final data is sent out on that date. When the material did come in he was told by Great Earth that the O'Hearns had to be removed from the catalogue. However, Mizrahi testified that he did not do anything after September 18 to change the catalogue in any way, nor did he recall if anyone from the defendants advised him, after September 18, to print new materials without the O'Hearn image.

Mizrahi explained that he had to redo the new catalogue made on September 18, 1998, to remove the O'Hearn image:

Q Can you tell me what the difference between the old catalogue and the new catalogue was as it relates to the O'Hearns?

. . . .

A There were, I believe 28 or 32 pages in the catalogue, of which thirteen-pages had to be regenerated, and the job had to be restripped in its entirety because of pagination differences.

Q What about the O'Hearns, did they appear in the new catalogue?

A   Not at all.

Q   And you sent—when did you send the catalogues to the printers?

A   It went to the facility on the evening of September 18th.

(Tr. at 205–06).

## V.  *DISCUSSION*

### A.  *The Applicable Law*

■ In the January 20, 1999 Order, the Court reviewed the applicable law in a civil contempt proceeding. Without unnecessary repetition, the Court reiterates the three-prong test established by the Second Circuit in order to prove a civil contempt: (1) there is a failure to comply with a clear and unambiguous order of the court; (2) proof of the noncompliance is clear and convincing; and (3) the alleged contemnor has not been reasonably diligent and energetic in attempting to accomplish what was ordered. *City of New York v. Local 28,* 170 F.3d 279, 282–83 (2d Cir.1999); *E.E.O.C. v. Local 638, Sheet Metal Assoc.,* 81 F.3d 1162, 1171 (2d Cir.1996) ("*E.E.O.C.VII*") (quoting *United States v. Local 1804–1 Int'l Longshoremen's Ass'n,* 44 F.3d 1091, 1096 [2d Cir.1995] ); *King v. Allied Vision Ltd.,* 65 F.3d 1051, 1058 (2d Cir.1995); *Dunn v. New York State Dep't of Labor,* 47 F.3d 485 (2d Cir.1995); *EEOC v. Local 580,* 925 F.2d 588, 594 (2d Cir. 1991).

■ The legal lines are clear in this case. There is no doubt, and the defendants concede that: (1) the orders at issue were clear and unambiguous; and (2) proof of non-compliance is clear and convincing. The sole issue in this case is whether the defendants have been reasonably diligent and energetic in attempting to accomplish compliance with the orders at issue. In this Court's view, the defendants have clearly shown that they have met the standard of reasonable diligence.

The offending ad was published in a February 1999 magazine. The problem in this situation was exacerbated by the usual time sequence in publishing a magazine; namely, that the printed material must be submitted months prior to the publication date. The Court finds that, despite the conscientious and meaningful efforts on the part of the defendants to stop all advertisements containing the O'Hearns' images, this ad inadvertently slipped through the cracks. Also, the Court accepts the fact that "Fischman simply forgot that the powder ad containing a likeness of O'Hearn had been placed." (Tr. at 63–64).

At the hearing, there was presented clear and convincing evidence of the good faith effort by the defendants to comply with the court orders. The Court was impressed with and credits the testimony of Chief Operation Officer Stern, a practicing attorney. Stern's September 18, 1998 memorandum (Dft.Ex.A) is clear, demonstrative evidence of the defendants' bona fide attempt by the defendants to be "reasonably diligent and energetic" in complying with the Court orders. Stern directed each executive in each of the defendant companies "to comply with the Court's directions without fail." He expressly warned his people that "a violation of the Court's direction could be met with fines or penalties" and he concluded the memorandum with the strong command: "This means no consumer is to receive anything with the O'HEARNS name or likeness— indeed, no one is to. Nothing is to be forwarded by anyone."

The Court is further persuaded by the sincerity of the efforts by Stern. With reasonable certainty, it makes sense that as a practicing attorney he treated the court orders "very seriously."

Also, the defendants presented substantial proof of the detailed, time-consuming and costly attempts to comply with the court orders. In addition, Fischman sent a clear memorandum to the advertising agency advising them that "No ads with any picture of Mike and/or Midajah O'Hearn are to be run in any magazine." Mel Rich detailed the appropriate "whole strategy" devised by the defendants to

eliminate the O'Hearn likenesses. Finally, Alan Mizrahi explained how he had to redo the catalogue to remove the O'Hearn images. The Court credits all of this testimony, buttressed by the relevant exhibits.

The Court finds that the actions of the defendants were based on "a good faith and reasonable interpretation of the court order," including the proper marshaling of its resources to comply with the orders, and it did "demand needed results from subordinate individuals." *See Schmitz v. St. Regis Paper Co.*, 758 F.Supp. 922, 927 (S.D.N.Y.1991).

## VI. *CONCLUSION*

In the hearing, the defendants have established, by clear and convincing evidence, that they were "reasonably diligent and energetic" in attempting to comply with the court orders. The Court finds that the offending ad just "slipped through," notwithstanding herculean efforts on the part of the defendants to remove all such images. Accordingly, the plaintiffs' motion to hold the defendants in civil contempt for using Michael O'Hearn's photograph in their advertisement, placed in the February 1999 issue of Natural Bodybuilding and Fitness Magazine, is denied.

The attorneys and parties are reminded that the trial of this case is expedited and is set down for the selection of a jury on September 27, 1999 at 9:00 a.m.

**SO ORDERED.**